COTTAGE SAVINGS ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 27487-83.        Filed March 14, 1988.

*Dennis L. Manes, Scott M. Slovin,* and *Richard M. Schwartz,* for the petitioner.*

*Briefs amici curiae were filed by Richard L. Bacon and Thomas A. Pfeiler (as attorneys for the U.S. League of Savings Institutions), by Robert W. Minor, George N. Corey, and Aaron

*Joseph R. Goeke* and *Mary Helen Weber*, for the respondent.

CHABOT, *Judge:* Respondent determined deficiencies in Federal corporate income tax against petitioner for 1974 through 1980, as follows:

| Year | Deficiency |
| --- | --- |
| 1974 | $47,029.09 |
| 1975 | 62,889.23 |
| 1976 | 102,014.57 |
| 1977 | 154,520.26 |
| 1978 | 185,427.59 |
| 1979 | 54,187.23 |
| 1980 | 73,752.53 |

After a concession by petitioner,[1] the issue for decision[2] is whether petitioner realized recognizable losses from sales of 90-percent participations in loan portfolios to other savings and loan institutions, from which petitioner simultaneously acquired 90-percent participations of approximately equal aggregate value and, if so, whether petitioner may deduct those losses.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner's principal place of business was in Cincinnati, Ohio.

### Background

Since 1883, petitioner has been in the business of receiving savings deposits from the public and in turn making loans secured by residential and commercial real estate. Petitioner profited by making loans from deposits at interest rates higher than petitioner paid to depositors, and

Rosenfeld (as attorneys for the Ohio Savings & Loan League), and by Martin S. Schwartz and Aaron M. Peck (as attorneys for the California League of Savings Institutions).

[1] By a stipulation filed on Dec. 29, 1986, an adjustment relating to dividends on withdrawable savings has been conceded by petitioner; the concession may be withdrawn if, before we file our opinion in the instant case, the Court of Appeals for the Seventh Circuit has rendered an opinion reversing our decision in *Colonial Savings Association v. Commissioner,* 85 T.C. 855 (1985).

[2] The notice of deficiency adjustments relating to bad debts and charitable contributions are derivative and depend on the resolution of the issue for decision.

from charging points for the origination of such loans. Petitioner, a State-chartered mutual savings association, was a federally insured savings and loan institution subject to the regulations of the Federal Home Loan Bank Board (hereinafter sometimes referred to as the FHLBB). Petitioner was required to file semiannual financial reports to the FHLBB reporting petitioner's financial condition in conformity with accounting principles adopted by the FHLBB and commonly referred to as regulatory accounting principles (hereinafter sometimes referred to as RAP).

For 1980 and all the other years in issue (see note 6 *infra*), petitioner filed its income tax returns on a calendar-year basis and used the accrual method of accounting for all purposes.

In 1980, savings and loan deposits were declining because funds were being diverted to higher-yielding money market funds. Earnings of savings and loan institutions declined as interest paid on deposits exceeded the interest earned on loan portfolios. In addition, because of the increases in market interest rates, the market values of existing fixed-interest loan portfolios held by savings and loan institutions were substantially less than the book values of these loan portfolios.

In 1980, petitioner began to offer adjustable-rate mortgages, which would allow interest rates to be adjusted to meet changes in the market. The number and dollar volume of loans made by petitioner dropped, however. Petitioner experienced a shortage of funds because of the loss of deposits to money market mutual funds and because high interest rates charged by the FHLBB eliminated the FHLBB as a source of funds that petitioner could use to make profitable loans. Petitioner expected the decline in deposits to continue.

FHLBB regulations required petitioner (and other federally insured savings and loan institutions) to meet certain net worth requirements. These requirements were revised by amendments published on November 6, 1980, with an effective date of November 17, 1980.

If petitioner had sold the loan participations described *infra*, and had been required by the FHLBB's RAP to reduce its net worth by the amounts of the losses that it would

have sustained (in table 4 *infra*, compare the last two columns; in table 5 *infra*, compare column (3) with column (4)), then petitioner's net worth would have been reduced to such a level that it would have barely exceeded the FHLBB's minimum requirements.

### Memorandum R-49

On June 27, 1980, the Director of the Office of Examination and Supervision (OES) of the FHLBB issued Memorandum R-49 relating to "reciprocal sales" of mortgage loans, with the following stated synopsis: "A LOSS NEED NOT BE RECORDED FROM 'RECIPROCAL SALES' OF SUBSTANTIALLY IDENTICAL MORTGAGE LOANS". The body of Memorandum R-49 states as follows:

The purpose of this memorandum is to advise OES staff on the proper accounting for reciprocal sales of mortgage loans.

A loss resulting from a difference between market value and book value in connection with reciprocal sales of substantially identical mortgage loans need not be recorded [under RAP]. Mortgage loans are considered substantially identical only when each of the following criteria is met. The loans involved must:

1. involve single-family residential mortgages,
2. be of similar type (e.g., conventionals for conventionals),
3. have the same stated terms to maturity (e.g., 30 years),
4. have identical stated interest rates,
5. have similar seasoning (i.e., remaining terms to maturity),
6. have aggregate principal amounts within the lesser of 2 1/2% or $100,000 (plus or minus) on both sides of the transaction, with any additional consideration being paid in cash,
7. be sold without recourse,
8. have similar fair market values,
9. have similar loan-to-value ratios at the time of the reciprocal sale, and
10. have all security properties for both sides of the transaction in the same state.

When the aggregate principal amounts are not the same and the principal amount of the mortgage loans purchased is greater than the principal amount of the mortgage loans sold, the purchaser should record the additional principal. The difference between the additional principal and the additional cost should be recorded as a discount and amortized over a period of not less than ten years. If the principal amount of the mortgage loans purchased is less than the principal amount of those originally sold, the purchaser should reduce its loan account. The

difference between the reduction in loans and the amount of cash received should be charged to loss on sale of mortgage loans.

If a reciprocal sale does not meet all of the above criteria, the institution must record losses resulting from the sale.

Memorandum R-49 was the FHLBB's response to a desire of the savings and loan industry to structure exchanges of mortgage loans to create losses for income tax reporting purposes which would not be reported under RAP or under generally accepted accounting principles (hereinafter sometimes referred to as GAAP).

The criteria selected in Memorandum R-49 represented an attempt by the FHLBB, OES, to maintain the regulated institution's position with respect to three types of risk in a loan portfolio. These risks related to credit or collectibility, rate or future earnings potential, and repayment or extent of principal repayments and prepayments. In the opinion of the OES, a change in any of these risks would change the economic factors underlying a savings and loan institution's loan portfolio and, as a result, require recording the resulting gain or loss under RAP.

A memorandum dated August 10, 1981, from the Director of the OES to the Executive Staff Director of the FHLBB, sets forth the following explanation with respect to the criteria listed in Memorandum R-49.

When developing the criteria contained in Memorandum R-49, we worked closely with the AICPA Committee on Savings & Loan Associations. In addition to communication with this committee, we also obtained agreement with our stance from prominent CPA's serving the industry. * * * Our objective at that time was to structure a transaction which was as close as possible to the IRS "materially different" definition which would still not change the economic position of the association after it engaged in the swap. It was and remains our opinion that Memorandum R-49 represents a transaction which is on a fine line between "substantially identical" and "materially different".

These criteria represented our attempt to maintain the association's position with respect to the three types of risks in a loan portfolio. These risks relate to credit (collectibility), rate (future earnings potential), and repayment (extent of principal repayments and prepayments). In our opinion, a change in any of these risks would change the economic factors underlying an association's loan portfolio and, as a result, require recording the resulting gain or loss.

The following schedule relates the ten criteria for nonrecognition, as outlined in Memorandum R-49, to these types of risks.

| Criteria | Credit | Risk Rate | Repayment |
|---|---|---|---|
| (1) involve only single family residential mortgages | X | | X · |
| (2) are similar type (conventional vs. insured) | X | | X |
| (3) same stated terms to maturity (i.e. 29 yrs.) | | | X |
| (4) identical stated interest rates | | X | X |
| (5) similar seasoning | | | X |
| (6) aggregate principal amounts within 2 1/2% or $100,000, with difference made up in cash | X | X | X |
| (7) sold without recourse | X | | |
| (8) similar fair market values | X | X | X |
| (9) similar loan to value ratio at time of maturity | X | | |
| (10) security properties in same state | | | X |

These criteria vary in importance and effect in achieving the desired objective (i.e. assuring that risk does not transfer). However, it is OES's opinion that all are necessary in their present form to structure the transaction which does not trigger a loss under GAAP.

## Transactions in Issue

Before and during 1980, the independent accounting firm engaged by petitioner was Frank Milostan & Associates (hereinafter sometimes referred to as Associates).[3] In October 1980, Frank Milostan (hereinafter sometimes referred to as Milostan) of Associates attended a week-long seminar given by an accounting firm in Houston, Texas. This seminar concerned the banking and savings and loan industries. At this seminar, Milostan was introduced to the concept of reciprocal loan sales. On his return to Cincinnati, Milostan asked the staff of Associates to consider the benefits of such a concept to Associates' clients.

On November 6, 1980, Associates gave a seminar in which the speakers highlighted the use of reciprocal sales to obtain refunds of Federal income taxes. The registration form mailed to Associates' clients and to the other savings and loan institutions which were invited to the seminar

---

[3]Associates did the legally required audit work for petitioner. Associates also prepared petitioner's tax returns and provided petitioner with consulting services and advice as to improving petitioner's profitability.

captioned the seminar "1980 TAX STRATEGIES FOR FINAN-
CIAL INSTITUTIONS (Your Contribution to the National
Debt!!)". Petitioner's president, William C. Kordis (hereinaf-
ter sometimes referred to as Kordis), was invited to attend
on behalf of petitioner, and he and at least one other officer
of petitioner attended the seminar.

Before attending the seminar, Kordis had discussed with
Milostan the possibility of reciprocal sales of mortgage
loans as a method of obtaining cash-flow resulting from tax
refunds. After the seminar, Kordis discussed with petition-
er's board of directors the possibility of entering into such
transactions, and invited Milostan to come and explain the
possibility in more depth to the board of directors. On
November 10, 1980, Milostan and Stanley Quay (an associ-
ate of Milostan) discussed reciprocal sale transactions with
petitioner's board of directors, and on that date the board
of directors passed the following resolution to enter into
such transactions:

RESOLVED: To enter into reciprocal sales of mortgage loans to other
non-related financial institutions in exchange for mortgage loans of
identical interest rates, stated maturities and seasoning. The reciprocal
sale of mortgage loans will not result in a gain or loss for finfncial [sic]
reporting purposes. (R-49) However, the reciprocal sale of mortgage loans
will result in an ordinary loss for Federal Income Tax purposes equal to
the difference between the book value of the portfolio sold and the fair
market value of the portfolio purchased on the date of sale. (Rev. Rul.
71-558)

On December 31, 1980, petitioner as "Seller" entered into
a series of loan participation sale and trust agreements as
shown in table 1.

Table 1

| Buyer | Number of loans | Total consideration |
|---|---|---|
| Rosemont Savings Association | 8 | $99,388.66 |
| Civic Savings Association | 44 | 655,575.72 |
| First Financial Savings Association | 188 | 3,432,714.35 |
| Kenwood Savings & Loan Association | 12 | 271,176.09 |

Also on December 31, 1980, petitioner as "Buyer" entered into a series of loan participation sale and trust agreements as shown in table 2.

Table 2

| Seller | Number of loans | Total consideration |
|---|---|---|
| Rosemont Savings Association | 8 | $98,257.50 |
| Civic Savings Association | 45 | 655,488.29 |
| First Financial Savings Association | 240 | 3,431,868.28 |
| Kenwood Savings & Loan Association | 12 | 271,298.43 |

Rosemont Savings Association, First Financial Savings Association, and Kenwood Savings & Loan Association are Ohio corporations located in Cincinnati, Ohio. Civic Savings Association is an Ohio corporation with its principal offices in Portsmouth, Ohio. (These four associations are hereinafter sometimes collectively referred to as petitioner's trading partners.)

Each of petitioner's trading partners was unrelated to petitioner, was run by other people, and had a board of directors that was separate from that of any of the other of petitioner's trading partners.

In each of the transactions described in table 1 or table 2, *supra* (hereinafter sometimes referred to as the December 31, 1980, transactions), the "Buyer" delivered to the "Seller" a check for the total consideration stated in the applicable agreement. Checks were thus exchanged on December 31, 1980, as shown in table 3.

Table 3

| Savings and loan institution | Amount paid to petitioner | Amount paid by petitioner |
|---|---|---|
| Rosemont Savings Association | $99,388.66 | $98,257.50 |
| Civic Savings Association | 655,575.72 | 655,488.29 |
| First Financial Savings Association | 3,432,714.35 | 3,431,868.28 |
| Kenwood Savings & Loan Association | 271,176.09 | 271,298.43 |
| Total | 4,458,854.82 | 4,456,912.50 |

No other cash payments were made between petitioner and petitioner's trading partners as consideration for the reciprocal sales.

Each of the December 31, 1980, transactions was at then-current fair market values. The then-current interest rate used in computing these fair market values was 14.863 percent. The loans, participations in which were sold by petitioner, had declined in value before the sales.

Table 4 presents information about the loans that were the subjects of the 90-percent participation transfers from petitioner to Civic Savings Association.

Table 4

| Number of loans | Interest rate percent | Original term years | Average inception date | Remaining loan balance as of 12/24/80 | Market value |
|---|---|---|---|---|---|
| 1 | 7.5 | 25 | 8/30/72 | $26,393.86 | $17,101.75 |
| 2 | 8.0 | 20 | 7/30/73 | 22,227.65 | 15,945.98 |
| 1 | 8.25 | 20 | 7/30/73 | 8,714.76 | 6,334.47 |
| 1 | 8.5 | 25 | 5/31/76 | 17,739.61 | 11,728.76 |
| 2 | 8.5 | 25 | [1]2/29/77 | 84,449.97 | 55,398.77 |
| 2 | 8.5 | 30 | 4/30/77 | 65,259.06 | 40,960.32 |
| 1 | 8.75 | 20 | 5/31/76 | 35,353.74 | 25,267.99 |
| 3 | 8.75 | 20 | 10/31/76 | 61,933.13 | 44,012.84 |
| 3 | 8.75 | 20 | 9/30/77 | 53,074.67 | 37,265.73 |
| 2 | 8.75 | 25 | 6/30/74 | 26,755.85 | 18,392.94 |
| 2 | 8.75 | 25 | 7/31/75 | 32,339.03 | 21,966.89 |
| 2 | 8.75 | 25 | 6/30/76 | 44,398.86 | 29,874.55 |
| 1 | 8.75 | 25 | 1/31/77 | 18,876.01 | 12,628.47 |
| 6 | 8.75 | 25 | 9/30/77 | 176,795.31 | 117,539.59 |
| 1 | 8.75 | 30 | 7/31/75 | 34,220.30 | 22,217.99 |
| 2 | 8.75 | 30 | 9/30/76 | 67,060.24 | 43,172.54 |
| 2 | 8.75 | 30 | 8/31/77 | 93,705.71 | 59,955.09 |
| 1 | 9.0 | 20 | 5/31/75 | 9,820.84 | 7,222.76 |
| 1 | 9.0 | 20 | 4/30/76 | 11,589.66 | 8,417.92 |
| 1 | 9.0 | 20 | 10/31/77 | 25,725.41 | 18,334.46 |
| 3 | 9.0 | 20 | 4/31/78 | 59,402.73 | 42,086.14 |
| 4 | 9.0 | 25 | 3/31/78 | 107,597.53 | 72,591.52 |
| 44 | | | | 1,083,429.93 | 728,417.47 |
| 90 percent participations | | | | 975,086.94 | 655,575.72 |

[1]So indicated in the stipulated exhibit.

Table 5 shows, by buyer, the aggregate remaining loan balances of the loans participations which were transferred by petitioner, 90-percent of these aggregate balances, the amount the buyer paid to petitioner, and the relationship of the amount paid to the loan balance transferred.

Table 5

| (1) | (2) | (3) | (4) | (5) |
| --- | --- | --- | --- | --- |
| | *Remaining loan* | | | *Column (4)* |
| | *balance as* | *Ninety* | *Amount paid* | *as percent of* |
| *Buyer* | *of 12/31/80* | *percent* | *to petitioner* | *column (3)* |
| Rosemont Savings Association | $162,326.47 | $146,093.82 | $99,388.66 | 68.03 |
| Civic Savings Association | 1,083,429.93 | 975,086.94 | 655,575.72 | 67.23 |
| First Financial Savings Association | 5,963,676.47 | 5,367,308.82 | 3,432,714.35 | 63.96 |
| Kenwood Savings & Loan Association | 465,242.23 | 418,718.01 | 271,176.09 | 64.76 |
| Totals | 7,674,675.10 | 6,907,207.59 | 4,458,854.82 | 64.55 |

Each of the loan participation sale and trust agreements entered into by petitioner on December 31, 1980, states "Seller hereby sells and issues to buyer * * * a 90-percent participation ownership (subject to the terms and conditions of said Participation Agreement) in loans described in the list * * * attached hereto." The subject loans were described in packages by interest rate, total term, and term to maturity. The packages which were subject to the agreements were matched under the criteria of FHLBB Memorandum R-49.

As a result of the December 31, 1980, transactions, petitioner was required to undertake additional administrative activity. Petitioner continued to service the loans in which it had sold the participations. Monthly reports of the transferred loan participations were prepared by each of the transferor institutions for each of the transferee institutions. In addition, payments on the participations were made monthly. Petitioner also had to record and maintain records relative to the payments on the participation packages received from petitioner's trading partners.

Petitioner and Associates considered it advantageous to sell 90-percent participation interests in the loans rather than selling the loans outright. Petitioner thus was able to maintain its relationship with the obligors on the loans, since these obligors were not aware that participation interests in their loans had been transferred. In addition, petitioner was not required to transfer the records associated with the mortgages to the buyers of the participation interests.

In entering into the December 31, 1980, transactions, petitioner relied on its officers' knowledge of the trustworthiness of the individuals from petitioner's trading partners and the assumed increase in value of the collateral from the date of the loans. In selecting the loans for inclusion, petitioner and petitioner's trading partners did not investigate individual loan files, employment histories of the individual borrowers, or the underlying value of the real estate securing the individual loans. Only current, i.e., nondelinquent, loans were considered.

The participations sold and bought by petitioner all were in loans that had different obligors, that were "conventional" loans secured by mortgages on single-family residential properties, and that were current as of December 31, 1980. The underlying security for each loan was different, in that each property had a different location. Most of the properties are inside the Cincinnati "beltway" (U.S. Highway I-275).[4] Most of the in-beltway properties where petitioner was the seller are east of downtown Cincinnati, while the in-beltway properties where petitioner was the buyer are more evenly distributed throughout the area. Some of the properties where petitioner was the buyer are as far north as Dayton, Ohio (about 55 miles from Cincinnati), and some are as far east as Jackson, Ohio (about 120 miles from Cincinnati). Of the properties where petitioner was the seller, some are as far north as Middletown, Ohio (about 35 miles from Cincinnati), and some are as far east as Batavia, Ohio (about 25 miles from Cincinnati).

Sales or purchases of participations, such as the 90-percent participations involved in this case, are customary; and loans that are sold or purchased are usually sold or purchased in a group by savings and loan institutions. Reciprocal sales of loans by savings institutions occurred before the December 31, 1980, transactions. Although diversification by geography and other factors may be reasons for reciprocal sales transactions generally, such factors were not considered in the December 31, 1980, transactions.

---

[4]Portions of Indiana and Kentucky are inside the Cincinnati beltway, but all of the properties are in Ohio. See Memorandum R-49, item 10, *supra.*

In the savings and loan industry, it is recognized that, generally, mortgage loans do not run to the completion of the terms of the loans. Petitioner made no attempt to determine, on a loan-by-loan basis or an aggregate basis, whether there was a difference between the prepayment potential or anticipated income stream of the loan participations received by petitioner and those transferred by petitioner on December 31, 1980. Actual collections did not achieve the equality anticipated at the time of the transfers.

Table 6 shows the actual payments that were made on account of the loan participations that petitioner sold and the loan participations that petitioner bought in the December 31, 1980, transactions.

Table 6

*A. Payments on Participations that Petitioner Sold*

| Year | Principal | Interest | Total |
|------|-----------|----------|-------|
| 1980 (Dec.) | $34,701.50 | $21,382.87 | $56,084.37 |
| 1981 | 257,800.81 | 555,555.62 | 813,356.43 |
| 1982 | 436,363.54 | 535,448.10 | 971,811.64 |
| 1983 | 535,229.54 | 488,253.91 | 1,023,483.45 |
| 1984 | 531,543.80 | 448,783.87 | 980,327.67 |
| 1985 (thru Mar. 31) | 118,122.04 | 99,045.58 | 217,167.62 |
| Totals | 1,913,761.23 | 2,148,469.95 | 4,062,231.18 |

*B. Payments on Participations that Petitioner Bought*

| Year | Principal | Interest | Total |
|------|-----------|----------|-------|
| 1980 (Dec.) | $4,915.60 | $10,307.45 | $15,223.05 |
| 1981 | 340,987.22 | 551,244.92 | 892,232.14 |
| 1982 | 366,480.57 | 530,205.40 | 896,685.97 |
| 1983 | 545,186.08 | 483,669.37 | 1,028,855.45 |
| 1984 | 437,770.45 | 446,202.40 | 883,972.85 |
| 1985 (thru Mar. 31) | 46,956.78 | 106,916.30 | 153,873.08 |
| Totals | 1,742,296.70 | 2,128,545.84 | 3,870,842.54 |

Participation interests are less liquid than whole loans in the secondary market. That is, there is an active secondary market for mortgage loans but very little market for participation interests. As a result, after the December 31, 1980, transactions, petitioner and its trading partners all were in a less liquid position (except for their income tax refunds) than they had been before the December 31, 1980, transactions.

The December 31, 1980, transactions met the criteria of Memorandum R-49 of the FHLBB and qualified for nonrecognition of loss under RAP. Petitioner did not report under RAP any losses on the December 31, 1980, transactions.[5]

---

The December 31, 1980, transactions were between independent parties; the transactions were closed and completed; the transactions were bona fide. At the time of the transactions, petitioner and its trading partners anticipated that the income stream earned from the loan participations that were acquired would be substantially equal to the income stream earned from the loan participations that were sold. If this anticipated equality did not occur, absent misrepresentations, the party receiving less in actual collections had no recourse against the party receiving more.

Before the December 31, 1980, transactions, petitioner's loan portfolio had decreased in market value because of economic conditions general to the savings and loan industry. The losses claimed by petitioner accurately reflect the decrease in petitioner's assets from book value to market value.

The December 31, 1980, transactions were motivated solely by the desire of petitioner and its trading partners to recognize for tax purposes (but not for regulatory purposes) the losses in market values of the loan portfolios each institution owned before the December 31, 1980, transactions.

OPINION

Respondent contends that the December 31, 1980, transactions were exchanges, and not independent purchases and sales; that, in order for gain or loss to be recognized on these transactions, the gain or loss must be realized; that

---

[5]In the notice of deficiency, respondent allowed bad debt loss deductions on some of the loans that petitioner had sold participations in, as part of the Dec. 31, 1980, transactions. The computation of the loss claimed by petitioner on the reciprocal sales transactions is not in dispute.

there was no realization of gain or loss under section 1001[6] because the property that petitioner gave was not materially different from what petitioner received; and that petitioner's claimed losses lack substance and are not allowable under section 165(a) because the transfers were solely tax-motivated and resulted in no significant change in petitioner's economic position. Respondent concedes that petitioner's claimed losses on the sales of the loan participations would have been realized, recognized, and deductible but for petitioner's simultaneous acquisition of the loan participations, as shown in tables 1 and 2, *supra.*

Petitioner maintains that the December 31, 1980, transactions were sales and not exchanges; that the nonrecognition provisions in section 1.1001-1(a), Income Tax Regs., are "inapplicable and * * * overridden by the other provisions in the Regulations and the Internal Revenue Code"; that even if the regulation applies, the mortgage loans with different obligors are not substantially similar and they differ materially in kind or extent; that the treatment of the December 31, 1980, transactions for purposes of GAAP and RAP has no effect on tax treatment; and that the transfers "were for a valid economic purpose".

We agree with respondent that the December 31, 1980, transactions were exchanges, and not independent purchases and sales; that these transactions were solely tax-motivated and had no business purpose other than to secure refunds of previously paid taxes by generating substantial net operating loss carrybacks; and that, in order for a gain or loss to be recognized, the gain or loss must be realized. We agree with petitioner that it realized the claimed losses on these transactions, that these losses are recognizable, and that these losses are deductible.

---

[6]Unless otherwise indicated, all section and subtitle references are to sections and subtitles of the Internal Revenue Code of 1954 as in effect for 1980. The instant case involves 1974 through 1979 because the Dec. 31, 1980, transactions, if given their claimed tax effect, produce net operating losses that are properly carried back to each of the earlier years. Petitioner filed a claim for tentative refunds and the tentative refunds were paid. Thus, although the dispute before us affects petitioner's tax liabilities for each year in the 7-year period, the resolution of the dispute depends entirely on the treatment of the Dec. 31, 1980, transactions.

## Sales v. Exchanges

As a preliminary matter, we reject petitioner's contentions that the four pairs of transactions occurring on December 31, 1980, were not reciprocal and cannot be regarded as "exchanges" as distinguishable from "sales". Petitioner argues that the loan sales transactions occurred between petitioner, on the one hand, and four other savings and loan institutions, on the other, solely as a matter of expediency. Petitioner denies that the transactions were reciprocal, interdependent, or conditioned on one another, and points out that the agreements do not expressly make them interdependent.

The obvious and expressed intention of the contracting parties was to come within the terms of Memorandum R-49. That memorandum specifically referred to "reciprocal sales of substantially identical mortgage loans". The testimony at trial, including that of Kordis, referred to the transactions as reciprocal. Kordis testified that, but for the deposit of checks from petitioner's trading partners in the December 31, 1980, transactions (see table 3 *supra*), petitioner "probably" would have had to borrow funds in order to be sure that its checks would be honored. Milostan further described the December 31, 1980, transactions as interdependent. Petitioner did not object to respondent's proposed finding, adopted by us *supra*, that Memorandum R-49 was the FHLBB's response to a desire of the savings and loan industry *to structure exchanges of mortgage loans* to create losses for income tax reporting purposes. Petitioner's counsel conceded, in his opening statement at trial, that petitioner bought about as much as it sold, "in order to comply with the regulatory accounting principle known as R-49, which required that loans be purchased in order not to recognize the loss [for] financial accounting purposes which, in most instances, if it had to be recognized, would have brought these savings and loans beneath the net worth requirements of the Federal Home Loan Bank." The only practical interpretation of the simultaneous purchases and sales were that they were interdependent in order to avoid the necessity of reporting losses under GAAP or RAP. Under these circumstances, the separate agreements will be regarded together as an overall transaction rather than as

separate sales between the contracting parties. See *Johnson v. Commissioner*, 495 F.2d 1079, 1082 (6th Cir. 1974), affg. 59 T.C. 791, 807-808 (1973); *Estate of Schneider v. Commissioner*, 88 T.C. 906, 938-942 (1987), on appeal (7th Cir., Oct. 6, 1987); *Monson v. Commissioner*, 79 T.C. 827, 834-837 (1982); *Smith v. Commissioner*, 78 T.C. 350, 380-381 (1982). Thus, we have adopted, for purposes of our opinion, respondent's characterization of the transactions as exchanges.

However, this conclusion does not resolve the case before us; it merely sets the framework for the remainder of our analysis. See *Monson v. Commissioner, supra*; *Smith v. Commissioner*, 78 T.C. at 385-390.

## Basic Analysis

Under section 1001,[7] if there has been a sale or other disposition of property and the taxpayer's basis exceeds the amount realized, then the resulting loss is to be recognized unless subtitle A provides otherwise. Respondent does not contend that any nonrecognition provision in subtitle A applies to the transfers of the mortgage loan participations in dispute in the instant case (except to the extent that section 1001 may be viewed as a nonrecognition provision). Under section 165(a),[8] the losses are deductible for 1980 (see note 6 *supra*) if they were sustained during 1980.

---

[7]Sec. 1001 provides, in pertinent part, as follows:

SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in sec. 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. In determining the amount realized—

(1) there shall not be taken into account any amount received as reimbursement for real property taxes which are treated under section 164(d) as imposed on the purchaser, and

(2) there shall be taken into account amounts representing real property taxes which are treated under section 164(d) as imposed on the taxpayer if such taxes are to be paid by the purchaser.

(c) RECOGNITION OF GAIN OR LOSS.—Except as otherwise provided in this subtitle [subtitle A, relating to income taxes], the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized.

[8]SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

On December 31, 1980, petitioner simultaneously bought and sold 90-percent participations in residential mortgage loans. The transfers were at then-current fair market values which, in the case of the participations that petitioner sold, were substantially below petitioner's cost bases. (See table 5 *supra*.) The loans that were affected were carefully selected by petitioner and by petitioner's trading partners to satisfy the equivalence criteria set forth in FHLBB Memorandum R-49, and also to match as nearly as practicable the aggregate fair market values of the loan participations transferred in the opposite direction. See tables 1, 2, and 3 *supra*. The transfers were bona fide, completed transactions. That is, petitioner assumed all the benefits and burdens of the loan participations it acquired, and petitioner's trading partners assumed all the benefits and burdens of the loan participations they acquired from petitioner.

The transfers were solely tax-motivated. That is, although participations often are sold for a variety of business reasons, in the instant case, the loan participation sales and offsetting purchases were effectuated solely to reduce petitioner's tax liabilities (and, presumably, the tax liabilities of petitioner's trading partners).[9] This, by itself, is not fatal to petitioner's claimed deduction in the context of the instant case (see, e.g., secs. 183(a) and 165(c)(2) for situations where this purpose might be conclusive),[10] but it does require us

---

[9]Petitioner contends that there were other reasons, specifically geographic diversification, improving relations with other institutions, increasing its servicing portfolio, and the possibility of faster payoffs. The record would not support a finding that any of these possible concerns played any part in the transactions of Dec. 31, 1980. In fact, the record supports a finding that they did not, and we have so found. Petitioner also states that "Milostan stated in his testimony that another reason to sell and repurchase loans was to reinvest the proceeds of the sale at prevailing market rates." However, table 3 *supra*, shows that almost 99.96 percent of petitioner's proceeds from the sales of participations were immediately used to buy participations from petitioner's trading partners. Table 6 *supra*, shows that petitioner's purchases resulted in a reduction in petitioner's cash flow. The only significant benefit petitioner received from the transactions was the tax loss deduction, which generated the net operating loss carrybacks, which in turn generated the tax refunds that led to the instant case (see note 6 *supra*). Kordis testified that he was not aware of any benefits other than the tax refunds (and what petitioner could earn by investing the tax refunds) when petitioner decided to enter into the Dec. 31, 1980, transactions. We conclude, and we have so found, that the generation of the tax loss deduction was the sole motive for the transactions in dispute.

[10]We emphasize that we are not, in the instant opinion, limiting the effect of our statements in "shelter" opinions, "family trust" opinions, and other opinions regarding the effect of taxpayers' motives. In the instant case, the Dec. 31, 1980, transactions were bona fide; they had non-tax economic consequences (see table 6 *supra*). In the instant case, although the Dec. 31, 1980, transactions were tax-motivated, they were merely the disposition of parts of assets that had previously been acquired by petitioner in the ordinary course of business in transactions entered into for profit. In the instant case, the taxpayer had already suffered

to scrutinize the record with particular care. *Joseph E. Widener, Trust No. 5 v. Commissioner*, 80 T.C. 304, 310 (1983).[11]

In *Widener*, stocks in different corporations were traded between two related trusts. The dispute was as to whether the relationship between the two trusts was such that the transactions "changed the flow of economic benefits from the stocks sold." 80 T.C. at 313. We held that they did, and allowed each trust to deduct its losses. In the instant case, the parties to the transactions are completely independent of each other. The dispute is as to whether the exchanged assets are sufficiently different from each other to warrant treating petitioner's losses as having been realized.

The loan participations are not fungible, unlike cash (see *Owens v. Commissioner*, 568 F.2d 1233, 1240 (6th Cir. 1977), affg. on this issue 64 T.C. 1 (1975)), or shares of stock of the same class in a given corporation (see *McWilliams v. Commissioner*, 331 U.S. 694, 702 (1947)). The underlying securities and the obligors on the loans differed one from another. The claimed losses were the market economic losses that petitioner had in fact suffered as a result of changes in interest rates. Actual collections on these loan participations after December 31, 1980, the date of the transfers, did not achieve the equality anticipated at the time of the transfers. (See table 6 *supra*.) The transfers clearly did change the flow of economic benefits from the loan participations.

In addition, before the December 31, 1980, transactions, petitioner owned real estate mortgage loans. After these transactions, petitioner owned (1) real estate mortgage loans diminished by 90-percent participations and (2) 90-percent participations in other real estate mortgage loans. Owner-

---

economic losses which were unrealized for tax purposes until Dec. 31, 1980; the Dec. 31, 1980, transactions merely were realizations of these losses for tax purposes (see tables 4 and 5 *supra*).

[11]For example, we recognize that institutions wishing to engage in mortgage loan exchanges might consider understating fair market values in order to maximize their claimed current loss deductions. In the instant case, respondent's counsel stated at trial that he does not challenge the fair market values that petitioner and its trading partners asserted in the disputed transactions and, based on that concession and on the unchallenged evidence describing how the fair market values were determined, we have found that each of the transactions was at then-current fair market values. Under the circumstances, we deem inappropriate the implications of respondent's proposed finding of fact that "Petitioner's interest in valuing the mortgage participation packages exchanged was not adverse to the interest of the other savings and loan institutions".

ship of participations in loans has a number of characteristics that differ from ownership of entire loans. (See our findings, *supra*, as to administrative advantages and burdens associated with loan participations (pp. 381-382) and diminished liquidity of loan participations (pp. 383-384).)

We conclude that petitioner realized and sustained the claimed losses in 1980, that petitioner is required to recognize these losses for 1980, and that petitioner is entitled to deduct these losses for 1980.

## Realization and Recognition

Respondent contends that "The resolution of this case rests largely upon the application of Treasury Reg. sec. 1.1001-1(a)[12] which limits the realization of gain or loss under section 1001 to transactions in which property is exchanged for 'other property differing materially either in kind or in extent' ".

The first sentence of this section of the regulation may be read as providing that income or loss is sustained if the income or loss is realized, and if this realization occurs from an "exchange of property for other property differing materially either in kind or in extent". The regulation could have, but does not state that this is the only way in which income or loss is sustained.[13] However, respondent reads

---

[12]Sec. 1.1001-1(a), Income Tax Regs., provides, in pertinent part, as follows:

Sec. 1.1001-1. Computation of gain or loss.

(a) *General rule.* Except as otherwise provided in subtitle A of the Code, the gain or loss realized from the conversion of property into cash, or from the exchange of property for other property differing materially either in kind or in extent, is treated as income or as loss sustained. The amount realized from a sale or other disposition of property is the sum of any money received plus the fair market value of any property (other than money) received. The fair market value of property is a question of fact, but only in rare and extraordinary cases will property be considered to have no fair market value. The general method of computing such gain or loss is prescribed by section 1001(a) through (d) which contemplates that from the amount realized upon the sale or exchange there shall be withdrawn a sum sufficient to restore the adjusted basis prescribed by section 1011 and the regulations thereunder (i.e., the cost or other basis adjusted for receipts, expenditures, losses, allowances, and other items chargeable against and applicable to such cost or other basis). The amount which remains after the adjusted basis has been restored to the taxpayer constitutes the realized gain. If the amount realized upon the sale or exchange is insufficient to restore to the taxpayer the adjusted basis of the property, a loss is sustained to the extent of the difference between such adjusted basis and the amount realized. * * *

[13]Respondent draws our attention to Treas. Regs. 45, Art. 1563 (1920 ed.), which interprets sec. 202 of the Revenue Act of 1918 (see sec. 1405 of the act, 40 Stat. 1151), Pub. L. 65-254, 40 Stat. 1057, 1060. Art. 1563 provides, in pertinent part, as follows:

Art. 1563. Exchange of property.—Gain or loss arising from the acquisition and subsequent disposition of property is realized when as the result of a transaction between the owner and

that sentence as restricting "the occurrence of realization to situations where exchanged property differs materially in kind or extent." This appears to be equivalent to the converse of the language that is actually in the regulation.[14]

Our disagreement with respondent's conclusion does not rest on whether his regulation should be given the interpretation for which he contends. Rather, assuming that respondent is correct in his interpretation of his regulation, we conclude that the property petitioner acquired differs "materially * * * in kind" from the property petitioner

---

another person the property is converted into cash or into property (a) that is essentially different from the property disposed of, and (b) that has a market value. In other words, both (a) a change in substance and not merely in form, and (b) a change into the equivalent of cash, are required to complete or close a transaction from which income may be realized. By way of illustration, if a man owning ten shares of listed stock exchanges his stock certificate for a voting trust certificate, no income is realized, because the conversion is merely in form; or if he exchanges his stock for stock in a small, closely held corporation, no income is realized if the new stock has no market value, although the conversion is more than formal; but if he exchanges his stock for a Liberty bond, income may be realized, because the conversion is into independent property having a market value.

We note that this regulation explicitly states that there cannot be realization unless there is "a change in substance", and implies that a change in substance can only come from a conversion "into cash or into property (a) that is essentially different from the property disposed of". The present regulation (note 12 *supra*) omits any statement that there cannot be a realization unless there is a change in substance. Since respondent changed this part of the language of the regulation, one may reasonably infer that respondent intended to change the meaning of the regulation. See *Zuanich v. Commissioner*, 77 T.C. 428, 443 n. 26 (1981). Since the change in the language is to omit in the current regulation, the earlier regulation's relatively clear statement that realization requires an essential difference between the property acquired and the property disposed of, it may fairly be concluded that respondent has eliminated this essential-difference requirement.

[14]For an illustration of the danger of assuming that converses are equivalents, see the following colloquy from "A Mad Tea-Party":

The Hatter opened his eyes very wide on hearing this; but all he *said* was "Why is a raven like a writing-desk?"

"Come, we shall have some fun now!" thought Alice."I'm glad they've begun asking riddles—I believe I can guess that," she added aloud.

"Do you mean that you think you can find out the answer to it?" said the March Hare.

"Exactly so," said Alice.

"Then you should say what you mean," the March Hare went on.

"I do," Alice hastily replied; "at least—at least I mean what I say—that's the same thing, you know."

"Not the same thing a bit!" said the Hatter. "Why, you might just as well say that 'I see what I eat' is the same thing as 'I eat what I see'!"

"You might just as well say," added the March Hare, "that 'I like what I get' is the same thing as 'I get what I like'!"

"You might just as well say," added the Dormouse, which seemed to be talking in its sleep, "that 'I breathe when I sleep' is the same thing as 'I sleep when I breathe'!"

"It *is* the same thing with you," said the Hatter, and here the conversation dropped, and the party sat silent for a minute, while Alice thought over all she could remember about ravens and writing-desks, which wasn't much.

C.L. Dodgson, The Complete Works of Lewis Carroll (Alice's Adventures in Wonderland) 75-76 (Modern Library ed.).

transferred. We conclude, further, that the cases and concepts to which respondent directs our attention either are distinguishable or support petitioner's conclusion.

In support of respondent's interpretation of the regulation, respondent cites a series of cases, the best known of which is *Eisner v. Macomber*, 252 U.S. 189 (1920), in which courts have held that there was no taxable income from a transaction that left the stockholder with essentially the same position that the stockholder had in a corporation before the transaction in question. See *Towne v. Eisner*, 245 U.S. 418 (1918); *Weiss v. Stearn*, 265 U.S. 242 (1924).[15]

Respondent devotes a substantial portion of his brief to the history of predecessor statutes to section 1001, beginning with section II, B of the Tariff Act of 1913, Pub. L. 63-16, 38 Stat. 114, 167.[16] Various nonrecognition provisions begin in 1921 and continue through the Revenue Acts of 1926, 1928, 1932, 1936, and 1938, and in the Internal Revenue Codes of 1939 and 1954. Respondent summarizes his position as follows:

In limiting the realization of gains and losses to exchanges involving materially different property, Treas. Reg. sec. 1.1001-1(a) is a vestige of the prior regulations and early Revenue Acts and reflects a position that gain or loss arises upon a change in the substance, not merely in the form, of the taxpayer's property. In general, sections 165 and 1001 require that gain or loss be realized by a specific event involving either a conversion or exchange of property. The requirement embodied in Treas. Reg. sec. 1.1001-1(a) that a conversion or exchange take place before gain or loss is sustained implies that a material change in the taxpayer's property is necessary before a realization of gain or loss occurs under section 1001.

Respondent claims that his position is supported by *Shoenberg v. Commissioner*, 77 F.2d 446 (8th Cir. 1935), affg. 30 B.T.A. 659 (1934), and *Horne v. Commissioner*, 5 T.C. 250 (1945).

---

[15]We may pass over the irony that respondent now relies on cases in which he had earnestly argued that taxpayers had realized gains—and should be currently taxed on them—even though the taxpayers had received only proportionate stock dividends. In the instant case, the shoe appears to be on the other foot.

[16]Sec. II, B of the Tariff Act of 1913 provides, in pertinent part, as follows:

"B. That, subject only to such exemptions and deductions as are hereinafter allowed, the net income of a taxable person shall include gains, profits, and income derived from * * * sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in real or personal property, also from * * * dividends, * * * or gains or profits and income derived from any source whatever * * *"

In *Horne*, for the conceded purpose of establishing a tax loss (5 T.C. at 251), the taxpayer sold a certificate representing his membership (or "seat") in the New York Coffee & Sugar Exchange, Inc. Eight days before the sale, in order to assure uninterrupted membership in the exchange and in the use of the exchange's facilities, he bought another certificate that differed from the first only by identifying number on the certificate. Respondent contended in *Horne* that the wash sales provision (sec. 118, I.R.C. 1939) applied. We rejected that argument (5 T.C. at 253-254). Nevertheless, we concluded that the claimed deduction must be disallowed, following and quoting extensively from *Shoenberg* and summarizing the latter case's teaching as follows (5 T.C. at 254):

Underlying all of the loss deduction provisions of the statute is the concept of a financial detriment actually suffered by the taxpayer. Before any deduction is allowable there must have occurred some transaction which when fully consummated left the taxpayer poorer in a material sense. That principle was thoroughly expounded by the court in *Shoenberg v. Commissioner*, (C.C.A., 8th Cir.), 77 Fed. (2d) 446, affg. 30 B.T.A. 659; certiorari denied, 296 U.S. 586. There the taxpayer, for the purpose of establishing a tax loss, sold shares of stock through a broker at less than their cost and at the same time had the broker purchase a like number of the same shares for a wholly owned corporation. After the expiration of 30 days he then had the corporation transfer the shares back to him. In sustaining our disallowance of the loss deduction claimed the * * * [Court of Appeals] said:

"Among the transactions or identifiable events which may operate to realize and fix a loss, the most commonly occurring is a sale of the property. Here there was an actual sale of these shares, and, if our examination must stop with that sale, this loss is conclusively shown. The questions here are whether we can consider the entire situation which comprehends this sale, the purchase by the Globe Investment Company and the sale by it to the taxpayer; and, if we can, the effect thereof upon the above loss as being a deductible loss."

In our penultimate paragraph in *Horne*, we stated as follows (5 T.C. at 255-256):

Putting aside other considerations, the persuasive fact is that after consummation of the plan which petitioner had put into operation eight days previously he stood in exactly the same position as before, except that he was out of pocket $100, the difference between what he paid for his new certificate and what he received for his old one. One "seat" was exactly like another. As to how the $100 should be treated for tax purposes we are not now required to decide. Petitioner never divested

himself of the rights which he enjoyed by reason of his membership in the exchange, and never intended to do so. Although he went through the form of purchasing one certificate and selling another, the result was the same as if he had exchanged his certificate for that of another member. The deduction of a loss on such an exchange, that is, an exchange of property held for productive use in trade or business for property of a like kind to be held for such use, is expressly denied by sec. 112(b)(1) of the Internal Revenue Code [of 1939[17]].

In *Shoenberg*, the taxpayer, through his wholly owned corporation, was at all times in total control of shares of stock, indistinguishable from each other, and at the end of a short period of time was exactly where he started. In *Horne*, the taxpayer's position with respect to the asset, i.e., the exchange membership represented by both certificates, never changed.

In the instant case, in contrast, petitioner exchanged participations in some loans for participations in other loans. Although the loans were similar, there were important differences. Specifically, the loans had different obligors and were secured by different pieces of realty. The subsequent history of payments on the loans (see table 6 *supra*) shows that the transactions were real, not feigned, and that the assets received were not the same as the assets given up. In the instant case (unlike *Shoenberg* and *Horne*), when the smoke cleared away petitioner was left with assets that were different (and performed differently) from what petitioner had at the start. Thus, application of the principle of *Horne* and *Shoenberg* to the December 31, 1980, transactions leads us to conclude that the property is materially different, and petitioner is entitled to the claimed deductions.

Both sides urge us to be guided by *Hanlin v. Commissioner*, 38 B.T.A. 811 (1938), affd. 108 F.2d 429 (3d Cir. 1939). In *Hanlin* we applied the wash sales provision, section 118 of the Revenue Act of 1932,[18] to three sets of transactions. We held that municipal bonds of the same obligor (Philadelphia) with insignificant differences in maturity dates were substantially identical securities. 38 B.T.A.

---

[17]In the instant case, respondent expressly concedes the inapplicability of sec. 1031, the successor to sec. 112(b)(1), I.R.C. 1939.

[18]In the instant case, respondent expressly concedes the inapplicability of sec. 1091, the successor to sec. 118 of the Revenue Act of 1932.

at 813-818. We held that Federal Land Bank bonds of the same obligor (Omaha Federal Land Bank) with insignificant differences in maturity dates were substantially identical securities. 38 B.T.A. at 818-819.

However, we also held that bonds of the St. Louis and Wichita Federal Land Banks were not substantially identical to bonds of the Louisville Federal Land Bank. 38 B.T.A. 819-820. We rested our decision on the difference in obligors and the difference in assets underlying the promises of the different obligors. The Circuit Court of Appeals for the Third Circuit affirmed our conclusions as to all three sets of securities except that, with regard to the St. Louis, Wichita, and Louisville Federal Land Banks, the Circuit Court of Appeals focused more on the differing underlying securities than on the differing obligors. 108 F.2d at 431.

In the instant case, the obligors are different and the underlying securities are different. The *Hanlin* standards lead us to conclude that the mortgage participations that petitioner acquired differ materially from the mortgage participations that petitioner transferred.

Respondent insists that the *Hanlin* criteria support his position in the instant case. He points out that the Circuit Court of Appeals in *Hanlin* focused on the geographic differences between farmland near Wichita and farmland near Louisville, and directs our attention to the fact that "The geographical variations in risks of farm property which were critical to the decision in *Hanlin* are not present in this case, which involves residential real estate." Respondent overlooks the fact that *Hanlin* involved Federal Land Banks, each of which was at least secondarily liable on the debts of the others (108 F.2d at 431), while the instant case involves individual borrowers who apparently are each liable on only their own obligations. Respondent also overlooks the fact that, in *Hanlin*, each bond was secured by a mass of mortgages, so that only a regional disaster could affect the security of the bonds. Thus, in *Hanlin*, the courts focused on regional differences. In the instant case, each obligation apparently is secured by one residential property, so that a misfortune affecting one family or one property could affect what happens to that obligation without affecting any of the other obligations. We conclude that

petitioner's position in the instant case is stronger than the position that the taxpayer in *Hanlin* took with respect to the bonds of the St. Louis, Wichita, and Louisville Federal Land Banks.

## Mass Assets

Respondent argues that because the mortgage loans were sold in packages, they should be treated and valued as "mass assets" (rather than individually) as were assets in *United Mercantile Agencies, Inc. v. Commissioner*, 23 T.C. 1105 (1955), modified as to other issues sub nom. *Drybrough v. Commissioner*, 238 F.2d 735 (CA6 1956), and similar cases in other contexts, including *Tomlinson v. Commissioner*, 58 T.C. 570 (1972), affd. 507 F.2d 723 (9th Cir. 1974); *Marsh & McLennan, Inc. v. Commissioner*, 51 T.C. 56 (1968), affd. 420 F.2d 667 (3d Cir. 1969); *Manhattan Co. of Virginia, Inc. v. Commissioner*, 50 T.C. 78 (1968); *Westinghouse Broadcasting Co. v. Commissioner*, 36 T.C. 912 (1961), affd. 309 F.2d 279 (3d Cir. 1962); *Boe v. Commissioner*, 35 T.C. 720 (1961), affd. 307 F.2d 339 (9th Cir. 1962).

Petitioner stresses the importance of the different underlying assets and different obligors.

In *United Mercantile*, the taxpayer bought a mixed aggregate of claims from the liquidators of four insolvent banks. We held as follows (23 T.C. at 1117):

> In the instant case apportionment [of a purchase price among each of the claims purchased] would be wholly impracticable. In each purchase United acquired hundreds of differing items, each having a highly speculative value if any value at all. Only years of attempting to collect on the various items would disclose which were worthless, the amount collectible on others, and whether the over-all purchase would result in a gain or loss.
>
> Respondent argues that as United's bid was influenced by whether the individual debtors were listed in the telephone books, by competitive bids which were made either on individual items or groups of individual items, and by information furnished by the liquidator concerning various items, there was a practical basis for allocation. We disagree. While this information was useful in determining an aggregate bid price, where the number of items involved would tend to balance out errors in estimates, it would not constitute a proper, rational, or reasonably accurate basis for allocating to each individual item a part of the cost. Under the circumstances, we think United properly recovered its cost before

reporting a profit. *Webster Atwell*, 17 T.C. 1374 [1952] * * * ; *Inaja Land Co., Ltd.*, [9 T.C. 727 (1947)] * * * ; *William T. Piper*, [5 T.C. 1104 (1945)]; *John D. Fackler*, 39 B.T.A. 395 [1939].

In the instant case, each of the participations that petitioner sold had an easily determinable basis and sales price, and each of the participations petitioner bought had an easily determinable cost. (See table 4 *supra.*) Consequently, if the rationale of *United Mercantile* is to be a guide to the instant case, then its guidance is that the factual setting of the instant case requires us to hold here for petitioner.

In *Tomlinson* and in *Marsh & McLennan*, we (and the respective Courts of Appeals) held that the insurance expirations and loss experience records could not give rise to amortization deductions or business loss deductions on the records in those cases because (1) these intangibles were too closely related to nondeductible and nonamortizable goodwill, (2) even if severable from goodwill, no useful life had been established for the intangibles, and (3) no separate bases had been established for the individual expirations. None of the factual elements that we (and the respective Courts of Appeals) held to be critical in *Tomlinson* and in *Marsh & McLennan* are present in the instant case. The *Tomlinson* and *Marsh & McLennan* criteria lead to a holding for petitioner in the instant case.

In *Manhattan Co.*, we held that it was possible to apportion the taxpayer's cost of the acquired intangibles between customer lists (75 percent) and goodwill (25 percent), and to determine the useful life of the customer lists with reasonable accuracy (5 years); we rejected the taxpayer's effort to allocate the cost among the separate customers. Although the result in *Manhattan Co.* is different from that in *Tomlinson* and in *Marsh & McLennan*, the criteria appear to be the same. Our conclusion in the instant case also is the same; those criteria lead to a holding for petitioner in the instant case.

In *Westinghouse* and in *Boe*, we held that the customer service contracts there involved could not give rise to amortization deductions because (1) no separate bases had been established for the individual contracts and (2) no useful life had been established for the mass of the

contracts. The Court of Appeals in *Boe*[19] agreed, but as an alternative concluded that the taxpayers had not established any separation between the contracts and nonamortizable goodwill. The criteria of *Westinghouse* and *Boe* also lead to a holding for petitioner in the instant case.

Thus, respondent's mass asset theory does nothing to advance his contentions, and all the cases he cites support petitioner's position in the instant case.

As in *Smith v. Commissioner*, 78 T.C. at 385-389, respondent is asking us to create a nonstatutory wash sale doctrine.

Our problem in accepting respondent's position is analogous to that we faced in *Smith* dealing with the proper tax treatment of silver futures "straddle"[20] trading on the Commodity Exchange.

In *Smith*, we stated as follows (78 T.C. at 387-389):

Respondent's real, if obliquely articulated, objection, it seems to us, is that it is unfair to let petitioners recognize their losses because they knew ahead of time that there would likely be sufficient unrealized gain in their short July 1974 legs to borrow against so that they would not have to suffer any economic discomfiture on the switch. We might be more sympathetic with respondent's argument if in fact petitioners were guaranteed to have an exact offsetting unrealized gain available on August 9. However, here, they were not so assured. Contracts in different delivery months could, and in fact, did, show varying relative prices during the course of petitioners' straddles trades. While the actual pricing differences may have been small considering the size of petitioners' investments, we are not prepared to say such differences were de minimis. For us to draw a line, here, by saying that investments in these different assets must be integrated for tax purposes because their prices travel too much in tandem, simply begs the question: How nearly parallel is too nearly parallel? If platinum and gold futures prices travel roughly in tandem, are we to integrate a straddle in opposing platinum and gold futures? If the prices of certain utility stocks travel in a parallel fashion, are we to integrate a long position in utility A stock with a short position in utility B stock? A little reflection shows that straddles may be maintained in almost anything.

The complexity of enunciating a theory defining which investments are too nearly parallel is demonstrated by section 1092, added to the Code by

---

[19]This issue was not appealed in *Westinghouse Broadcasting Co. v. Commissioner*, 36 T.C. 912 (1961), affd. 309 F.2d 279 (3d Cir. 1962), and the Court of Appeals did not comment on this issue.

[20]In *Smith v. Commissioner*, 78 T.C. 350, 355 (1982), we defined a commodity straddle as simultaneous holding in a long position in one delivery month and a short position in another delivery month.

the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 501, 95 Stat. 323. Section 1092 sets up various rebuttable presumptions regarding what positions are "offsetting" for purposes of applying the new straddle provisions. Section 1092(c)(3)(A) states five statutorily defined factors which indicate a straddle in offsetting positions and authorizes the Secretary to promulgate regulations naming further factors (and thereby creating further rebuttable presumptions) which indicate offsetting positions. We do not believe it is within the province of this Court to attempt to draft our own novel straddle integration provision.

We conclude that in the instant case both a nonstatutory wash sale doctrine and the step transaction doctrine are inappropriate to achieve respondent's result. In the past, nonstatutory wash sale consequences have resulted in cases where a party has failed to completely relinquish an economic investment in the same or a substantially identical asset. *McWilliams v. Commissioner*, 331 U.S. 694 (1947); *Horne v. Commissioner*, 5 T.C. 250 (1945). In the instant case, after the switch, petitioners were not holding the same assets, March 1974 and December 1974 futures, but were instead holding May 1974 and September 1974 futures. These new positions were not substantially identical assets for purposes of the statutory wash sale provision (*Corn Products Refining Co. v. Commissioner, supra*, 16 T.C. [395] at 399-400 [1951], affd. on this issue 215 F.2d [513] at 516-517 [(CA2 1954)]), nor were they substantially identical for any other wash sale approach. *Harriss v. Commissioner, supra* [44 B.T.A. 999 (1941), affd. 143 F.2d 279 (CA2 1944)]; *Valley Waste Mills v. Page, supra* [115 F.2d 466 (CA5 1940)]. We fail to see how the mere simultaneous holding of a short July 1974 position throughout this period changes the result. Accordingly, a nonstatutory wash sale approach does not require the integration of petitioners' losses. [Fn. ref. omitted.[21]]

In the instant case, future collections on the loan participations sold could not be expected to coincide in dollar amount to collections on the participations purchased but would almost certainly exceed the fair market values of the loan portfolios as of December 31, 1980. As reflected in our findings, most loans do not run to their stated maturity dates. Bad debt losses occur. Discounting to the "present value" of future earnings, necessarily considered in determining fair market value, makes it likely that actual collections will exceed the new basis of loan portfolios obtained if the losses are recognized in these transactions. Petitioner would thereby achieve a present loss deduction and deferred gain recognition. This result alone, however,

---

[21]The parties in the instant case each presented expert witnesses who differed as to the significance of swapping individual residential loans or loan pools to the economic positions of the swapping institutions. The testimony exemplifies the numerous choices to be made in deciding whether a variable precludes or creates substantial identity or material difference.

does not compel judicial preclusion. See, e.g., *Smith v. Commissioner*, 78 T.C. at 389.[22] See also *Joseph E. Widener, Trust No. 5 v. Commissioner*, 80 T.C. at 310.

## RAP and GAAP

The parties have discussed the various pronouncements of the FHLBB and have presented expert testimony about what is or ought to be the required or permissible treatment of the December 31, 1980, transactions under GAAP.

The knowledgeable experts that the parties brought forth did "assist the trier of fact to understand the evidence or to determine a fact in issue", in accordance with rule 702, Federal Rules of Evidence. However, it is unclear whether under GAAP petitioner must report losses on the December 31, 1980, transactions, or must not report losses on these transactions, or may elect to report or not as it wishes. It is also unclear as to what effect GAAP should have on tax reporting in the context of the instant case. See, E.G., *Frank Lyon Co. v. United States*, 435 U.S. 561, 577 (1978).

As to the effect of Memorandum R-49, we note that "it has been consistently held that the accounting requirements of regulatory agencies are not controlling in the application of the revenue laws, which establish their own standards." *Bellefontaine Federal Savings & Loan Association v. Commissioner*, 33 T.C. 808, 811-812 (1960). (Citations omitted.) As to the significance of a non-tax agency's understanding of tax law, see *Graff v. Commissioner*, 74 T.C. 743 (1980), affd. 673 F.2d 784 (5th Cir. 1982).

As a result of the foregoing, we have examined the requirements of section 1001 in the context of the tax laws and the tax precedents that the parties have relied on—the determinations of the FHLBB and the accounting profession have neither led us to, nor away from, the conclusions we have reached.

---

[22]Respondent relies on *Smith v. Commissioner*, 78 T.C. 350 (1982), in his analysis of the Sale v. Exchange dispute, discussed *supra*. We agree with his reliance on *Smith* for that aspect of the instant case. However, *Smith* is a sword with several edges. The edge which is relevant on the aspect of the case dealt with at this point in the opinion's text cuts against respondent.

*Section 165*

Respondent's final contention is that petitioner is not entitled to a loss deduction under section 165(a). Respondent states as follows:

A transaction involving legally enforceable arrangements between legitimate entities may lack substance and fail to achieve the desired tax effect because it is purposeless apart from tax motivations. *Gregory v. Helvering*, 293 U.S. 465 (1935); *Davis v. Commissioner*, 585 F.2d 807 (6th Cir. 1978) [, affg. 66 T.C. 260 (1976)]; *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), [affg. 44 T.C. 284 (1965)].

In contrast to the cited cases, in the instant case—

(1) By December 31, 1980, petitioner had already suffered the real economic losses in transactions originally entered into for profit.

(2) On December 31, 1980, petitioner really did dispose of and acquire the loan participations; there were no limitations on the transfers that would cause petitioner to retain benefits or burdens on the loan participations it disposed of, or require shifting of benefits and burdens on the loan participations it acquired.

(3) The December 31, 1980, transactions were real transfers of real assets to and from unrelated parties.

We conclude that petitioner's realized, recognizable losses are deductible under section 165.

Respondent has drawn our attention to a recent opinion in *Centennial Savings Bank FSB v. United States*, 682 F. Supp. 1389 (N.D. Tex. 1988), in which the taxpayer lost on a record apparently essentially similar to that in the instant case. In *Centennial*, the court concluded that the transactions there in dispute were exchanges and not merely sales (we have come to the same conclusion as to the December 31, 1980, transactions in the instant case), that the parties to the transactions there in dispute paid little or no attention to individual characteristics of the loans there involved (we have come to the same conclusion as to the December 31, 1980, transactions in the instant case), and that no loss was realized as a result of the transactions there in dispute.

We note that the *Centennial* opinion relies on *Schoenberg v. Commissioner, supra,* and *Eisner v. Macomber, supra.* In

*Eisner v. Macomber*, the taxpayer was held not to have income from proportionate stock dividends which left her in the same relationship to the corporation that she had been in before the distribution. In *Schoenberg*, we summarized the situation as follows (30 B.T.A. at 661):

At the start of the series of steps the taxpayer had a certain number of shares in various companies; at the close he had precisely the same number of shares in the same companies.

In the instant case, petitioner started with real estate mortgage loans; after the December 31, 1980, transactions petitioner had (1) those loans diminished by 90-percent participations and (2) 90-percent participations in other loans. The different groups of loans had different obligors, had different collateral, and performed differently. The instant case is significantly different from the cases relied on in the *Centennial* opinion.

The *Centennial* opinion stresses the taxpayer's compliance with Memorandum R-49 and concludes that "If Centennial claims the benefits of alleged business purposes for entering into the R-49 transaction, it must also bear the burdens. It cannot have its cake and eat it too." As we have pointed out, the requirements of RAP do not control the tax laws. We do not believe it is appropriate to judicially modify the tax laws in order to offset (or to enhance) the effects of benefits and burdens that may be dispensed by regulatory agencies. See *Bellefontaine Federal Savings & Loan Association v. Commissioner, supra*; *Graff v. Commissioner, supra*. We take the tax law as we find it.

We disagree with part of the analysis in *Centennial* and with the conclusion in *Centennial*.

We hold for petitioner. Because of a concession by petitioner (note 1 *supra*),

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, PARKER, KÖRNER, SHIELDS, CLAPP, SWIFT, JACOBS, PARR, WELLS, and WHALEN, *JJ.*, agree with the majority opinion.

GERBER and RUWE, *JJ.*, did not participate in the consideration of this case.

---

COHEN, *J.*, concurring: I concur in the result reached in this case and in *Federal National Mortgage Association v. Commissioner*, 90 T.C. 29 (filed this same date) (*FNMA*), that the taxpayers realized and may recognize losses on exchanges of interests in mortgage loan portfolios. I disagree with the result reached by the District Court in *Centennial Savings Bank FSB v. United States*, 682 F. Supp. 1389 (N.D. Tex. 1988). The reason for my conclusion, however, differs from the analysis set forth in any of those opinions.

In this case and in *FNMA*, the Court finds that the loan portfolios that were the subject of the exchange transactions did differ materially, either in kind or extent, from each other. In *Centennial Savings Bank FSB*, the District Court concluded that the loan portfolios exchanged did not differ materially in kind or extent. It is possible, of course, to argue that these are merely permissible different conclusions reached by the respective trial judges, each of whom made findings of fact in support of his conclusion. It seems to me, however, that the correct result in these cases does not depend on such factual determinations.

My approach focuses on interpretation of section 1.1001-1(a), Income Tax Regs. As indicated in the majority opinion, that regulation could have, but does not state that income or loss is only sustained upon "exchange of property for other property differing materially either in kind or in extent" (p. 390); prior regulations containing such a requirement have not been carried forward in the current regulation (note 13); and the converse of a true statement is not necessarily true (note 14). Respondent contends that the regulation means that the gain or loss realized from the exchange of property for other property *not* differing materially either in kind or extent is *not* treated as income or loss. I believe that the regulation deals with *computation* of gain or loss and not with whether gain or loss will be realized or recognized.

The regulation, of course, is subordinate to the statute. Section 1001(c) provides:

SEC. 1001(c). RECOGNITION OF GAIN OR LOSS.—Except as otherwise provided in this subtitle, the entire amount of gain or loss, determined under this section, on the sale or exchange of property shall be recognized.[1]

The only relevant nonrecognition provisions or exceptions "otherwise provided in this subtitle" are the statutory wash sale provisions set forth in section 1031, dealing with like-kind exchanges, or section 1091, dealing with wash sales of stock or securities. The parties in this case (although not in *FNMA* or *Centennial*) agree that neither of those sections is applicable. Section 1031 expressly excludes applicability of the "like-kind exchange" rules to evidence of indebtedness. I suggest that this is an appropriate situation for applying the maxim *"Expressio unius est exclusio alterius."* See *duPont v. Commissioner*, 118 F.2d 544, 545 (3d Cir. 1941); 1 J. Mertens, Law of Federal Income Taxation, sec. 3.17.

As the majority points out, respondent is nonetheless asking that we adopt a nonstatutory wash sale provision. The majority correctly, in my view, rejects that position (pp. 397-399). I would hold that, as a matter of law, there is no requirement applicable in this case that the properties exchanged differ materially in kind or in extent.

NIMS, WHITAKER, WRIGHT and WILLIAMS, *JJ.*, agree with this concurring opinion.

---

[1]Sec. 1.1002-1(b), Income Tax Regs., promulgated under the predecessor of sec. 1001(c), states:

(b) *Strict construction of exceptions from general rule.* The exceptions from the general rule requiring the recognition of all gains and losses, like other exceptions from a rule of taxation of general and uniform application, are strictly construed and do not extend either beyond the words or the underlying assumptions and purposes of the exception. Nonrecognition is accorded by the code only if the exchange is one which satisfies both (1) the specific description in the code of an excepted exchange, and (2) the underlying purpose for which such exchange is excepted from the general rule. The exchange must be germane to, and a necessary incident of, the investment or enterprise in hand. The relationship of the exchange to the venture or enterprise is always material, and the surrounding facts and circumstances must be shown. As elsewhere, the taxpayer claiming the benefit of the exception must show himself within the exception.