FIRST FEDERAL SAVINGS & LOAN
ASSOCIATION OF
TEMPLE, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. W–86–CA–117.

United States District Court,
W.D. Texas,
Waco Division.

July 26, 1988.

Vester T. Hughes, Jr., Cynthia M. Ohlenforst, Dallas, Tex., H. Robert Powell, Austin, Tex., for plaintiff.

Walter B. Thurmond & Grover Hartt, III, Dept. of Justice, Tax Div., Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

WALTER S. SMITH, Jr., District Judge.

This cause came on for trial April 25, 1988, before the Court without a jury. Having considered the pleadings, evidence, and arguments of counsel, the Court enters the following findings of fact and conclusions of law.

### I. *Introduction*

This case presents the relatively novel issue of the tax treatment to be given to "reciprocal mortgage sales" conducted pur-

suant to the Federal Home Loan Bank Board's Memorandum R–49. The dispute concerns the deductibility of $3,715,132.00 in losses that Plaintiff, First Federal Savings and Loan of Temple, Texas ("Temple"), claims that it incurred through a "reciprocal sale" of mortgage "pools" with First Federal Savings and Loan of Waco, Texas on December 31, 1980. The Internal Revenue Service disallowed the claimed loss, and Temple brings this suit to recover a tax refund.

Temple is a savings and loan association organized under the laws of the State of Texas and has its principal place of business in Temple, Texas. In 1980, Temple was a federally insured mutual savings and loan association subject to review, supervision, and regulation of the Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation. Defendant, United States of America ("Government"), was duly served pursuant to Fed.R.Civ.P. 4(d)(4). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1340 and 1346(a)(1) and 26 U.S.C. § 7422. Venue is proper pursuant to 28 U.S.C. § 1402(a)(2).

This is an action arising under the Internal Revenue Code of 1954, as amended,[1] for the refund of income taxes and interest assessed against Temple during its tax year 1980. On September 15, 1981, Temple filed a federal corporate income tax return for the tax year ending December 31, 1980, and paid the taxes reported due. Thereafter, Temple filed a Form 1139, Corporate Application for Tentative Refund, on which it applied for tentative allowance of refunds for the taxable years 1970, 1971, 1972, 1973, and 1974, resulting from the carryback of a claimed net operating loss for the taxable year 1980. Tentative allowances were granted and refunds of $733,-179.00, exclusive of interest, were paid to Temple by the Government in accordance with the claims on the Form 1139. The net operating loss which constituted the basis

for the carryback losses reported on Temple's Form 1139 resulted from a loss claimed by Temple on the "reciprocal sale" of two pools of mortgage loans transferred in accordance with an agreement with First Federal Savings and Loan Association of Waco ("Waco"). On its Form 1139, Temple also claimed a carryback of unused investment tax credit to the years 1968 and 1969 which arose as a result of the carryback to 1971 and 1972 of the claimed net operating loss in 1980 due to the "reciprocal sale" of mortgage pools. On February 20, 1985, the Government issued statutory notices of deficiency to Temple for tax years 1970–74, and 1980. This deficiency was based upon the Internal Revenue Service's determination that Temple was not entitled to deduct (and, therefore, not carryback) a loss of $3,715,132.00 from the "reciprocal sale" transaction with Waco on December 31, 1980.

The deficiency assessment amounted to $1,546,394.13 ($878,564.00 in taxes and $667,830.13 in interest), which Temple timely paid on July 22, 1985. Of the total deficiency, $363,431.17 was the amount assessed for tax year 1980 ($207,343.00 in taxes and $156,088.17 in interest). It is the deficiency assessment for tax year 1980 ($363,431.17) which is at issue in this suit. On September 23, 1985, Temple timely filed a Claim for Refund with the Internal Revenue Service for the $363,431.17 paid by Temple for the deficiency assessed for tax year 1980. The Internal Revenue Service did not render a decision on the Claim for Refund within six (6) months, and this suit was filed to recover the claimed refund on June 4, 1986. The Parties agree that the only contested issue is the deductibility, including the realization,[2] of the claimed loss of $3,715,132.00 from the "reciprocal sale" of mortgage loan pools between Temple and Waco on December 31, 1980.

---

1. All Tax Code sections referenced in this opinion are from the Internal Revenue Code of 1954, as amended. For the sake of brevity the Court will refer to those sections by only title and number or simply as "the Code."

2. Although the Parties stipulate that "realization" of the loss in question is at issue, the Court is of the opinion that it is "recognition" of the loss that is actually the contested issue in this case, which is discussed *infra.*

## II. *Background of "Reciprocal Mortgage Sales"*

The "reciprocal sale" at issue in this case is the type of transaction that has become known in the savings and loan industry as an "R–49" transaction. This is because this type of "reciprocal sale" of mortgage loans is specifically designed to comport with the requirements of Memorandum R–49 published by the FHLBB.

"R Memoranda," such as Memorandum R–49, are publications issued by the Office of Examination and Supervision ("OES") of the FHLBB which have the force and effect of binding FHLBB regulations. FHLBB member institutions are required to comply with the R Memoranda as they would any other FHLBB regulation. Memorandum R–49, issued June 27, 1980, related to the regulatory accounting treatment [3] to be given "reciprocal mortgage sales." Memorandum R–49 reads:

> The purpose of this memorandum is to advise OES staff of the proper accounting for reciprocal sales of mortgage loans.
>
> A loss resulting from a difference between market value and book value in connection with reciprocal sales of substantially identical mortgage loans need not be recorded. Mortgage loans are considered substantially identical only when each of the following criteria is met. The loans involved must:
>
> 1. involve single-family residential mortgages,
> 2. be of similar type (e.g., conventional for conventional),
> 3. have the same stated terms to maturity (e.g. 30 years),
> 4. have identical stated interest rates,
> 5. have similar seasoning (i.e. remaining terms to maturity),
> 6. have aggregate principal amounts within the less of 2½% or $100,000 (plus or minus) on both sides of the transaction, with any additional consideration being paid in cash,
> 7. be sold without recourse,
> 8. have similar fair market values,
> 9. have similar loan-to-value ratios at the time of the reciprocal sale, and
> 10. have all security properties for both sides of the transaction in the same state.
>
> When the aggregate principal amounts are not the same and the principal amount of the mortgage loans purchased is greater than the principal amount of the mortgage loans sold, the purchaser should record the additional principal. The difference between the additional principal and the additional cost should be recorded as a discount and amortized over a period of not less than ten years. If the principal amount of the mortgage loans purchased is less than the principal amount of those originally sold, the difference should reduce its loan account. The difference between the reduction in loans and the amount of cash received should be charged to a loss on sale of mortgage loans.
>
> If a reciprocal sale does not meet all of the above criteria, the institution must record losses resulting from the sale.

Memorandum R–49 was a product of the financial crunch that savings and loan institutions were experiencing in the middle to late 1970's and early 1980's. The financial downturn in the savings and loan industry was the result of the decrease in profits and liquidity these institutions were incurring due to the differential between the low interest rates on outstanding loans and the increasing interest rates being paid on savings accounts and other obligations to depositors. This decrease in liquidity became significant because the FHLBB requires its member institutions to maintain specified liquidity levels for regulatory and financial accounting purposes. Savings and loan institutions wanted to sell their low interest mortgage loans, recognize their accumulating "book" loss for tax purposes (thus generating income through tax refunds), and reinvest the funds generated in higher interest loans or in similar low interest loans purchased from other institutions at a dis-

---

**3.** FHLBB member institutions are required to file financial statements with the OES in accordance with the FHLBB's promulgated Regulatory Accounting Principles (RAP).

count (*i.e.* with a reduced basis). The problem with conducting such transactions was that the FHLBB required its member institutions to report and account for losses incurred on the outright sale of mortgage loans, and such sales as those contemplated (*i.e.* large enough to produce significant tax refund income) would at least temporarily reduce some savings and loans' liquidity levels below the minimum required by the FHLBB.

In 1980, representatives of the accounting profession, members of the FHLBB, and savings and loan industry experts held meetings to discuss potential solutions to the industry's problems—Memorandum R–49 was the result. Memorandum R–49 allows savings and loan institutions to "reciprocally sell" very particular types of mortgage loans and not record or recognize a loss for regulatory or financial accounting purposes. This would allow savings and loan institutions to maintain requisite liquidity levels while then reporting a loss on their tax returns which could be carried-back to prior years and generate revenues through tax refunds.

Indeed, this was the entire purpose of Memorandum R–49. The drafters intended to carefully structure a transaction which would involve the "reciprocal sale" of property which would be at the same time "substantially identical" for regulatory and financial accounting purposes, yet "materially different" for tax accounting purposes thereby creating a transaction that does not generate an actual regulatory and financial loss, but sufficient to generate an actual tax loss. The Director of the OES explained the purpose of Memorandum R–49 to the Executive Staff Director of the FHLBB in the context of R–49's ten criteria in the following memorandum:

When developing the criteria contained in Memorandum R–49, we worked closely with the AICPA Committee on Savings and Loan Associations. In addition to communication with this committee, we also obtained agreement with our stance from prominent CPAs serving the industry. * * * Our objective at that time was to structure a transaction which was as close as possible to the IRS "materially different" definition which would still not change the economic position of the association after it engaged in the swap. It was and remains our opinion that Memorandum R–49 represents a transaction which is on a fine line between "substantially identical" and "materially different".

These criteria represented our attempt to maintain the association's position with respect to the three types of risks in a loan portfolio. These risks relate to credit (collectibility), rate (future earnings potential), and repayment (extent of principal repayments and prepayments). In our opinion, a change in any of these risks would change the economic factors underlying an association's loan portfolio and, as a result, require recording the resulting gain or loss.

The following schedule relates the ten criteria for nonrecognition, as outlined in Memorandum R–49, to these types of risks.

| Criteria | Credit | Rate | Repayment |
|---|---|---|---|
| 1) involve only single family residential mortgages | X | | X |
| 2) are similar type (conventional vs. insured) | X | | X |
| 3) same stated terms to maturity (i.e. 29 yrs) | | | X |
| 4) identical stated interest rates | | X | X |
| 5) similar seasoning | | | X |
| 6) aggregate principal amounts within 2½% or $100,000, with difference made up in cash | X | X | X |
| 7) sold without recourse | X | | X |
| 8) similar fair market values | X | X | X |
| 9) similar loan to value ratio at time of maturity | X | | |
| 10) security properties in same state | | | X |

These criteria vary in importance and effect in achieving the desired objective (i.e. assuring that risk does not transfer). However, it is OES's opinion that all are necessary in their present form to structure the transaction which does not trigger a loss under GAAP.

Thus, the purpose of Memorandum R–49 was to alleviate the economic pressure on savings and loan institutions by generating revenues in form of tax refunds, allowing the institutions an opportunity to liquidate accumulating "book" losses and reinvest in more profitable (i.e. lower basis) loans while devising a transaction which would leave a member institution in a similar enough economic position that a loss would not need to be recognized either under Generally Accepted Accounting Principles or Regulatory Accounting Principles.

### III. *The Transaction at Issue*

On December 31, 1980, Temple assigned to Waco 360 home mortgage loans on property located in the Temple area and which all conformed to the requirements of Memorandum R–49. On the same day, Waco assigned to Temple 287 home mortgage loans on property in the Waco area which also conformed to the requirements of Memorandum R–49. The aggregate remaining principal balance of the 360 Temple loans was $10,516,739.00, and the aggregate remaining principal balance on the 287 Waco loans was $10,503,499.00.[4] Waco paid Temple $6,801,607.00 for the loans assigned to it by Temple. Temple paid Waco $6,759,868.00 for the loans assigned to it by Waco. These figures were derived by discounting the loans, in bulk, at the prevailing Federal National Mortgage Association auction rate on December 31, 1980. Payment by each party was made by check delivered the same day. It is also undisputed by the Government that the loans "reciprocally sold" have different obligors, are secured by different pieces of property, and that all risk of loss associated with each loan transferred to the assignee.

At the same time that Temple and Waco "reciprocally sold" the two pools of mortgage loans, the two institutions entered into a "Whole Loan Sale and Servicing Agreement." Under this agreement, the servicing of the loans would stay with the assignor institution. That is, Temple would continue to do the accounting, collecting, posting, and other servicing of all the Temple-originated loans, and Waco would do the same with Waco originated loans. As far as the Temple area loan obligors were concerned, they would continue doing business entirely with Temple, just as the Waco area loan obligors would continue doing business entirely with Waco. Each institution would then forward the amounts collected on the loans (minus a servicing fee) to the assignee of the loans.

In deciding which loans would be included in the transaction, Temple ran a computer analysis of its home mortgage loans and culled out those which fit the ten criteria of Memorandum R–49. Neither Temple nor Waco examined the loans they were "purchasing" with respect to any factor other than the ten criteria of Memorandum R–49. No credit checks were done, no property was examined, no loan files were examined, and no histories were checked on any individual obligors. In short, the only thing that each institution knew about the loans it was receiving was that they all conformed to the criteria of Memorandum R–49.

Temple suggests that the Court should view the transaction as a series of one-for-one sales and in some instances two-for-one sales (to make up the discrepancy in the number of loans in each pool), such that the characterization of what transpired between Temple and Waco on December 31, 1980, would be approximately 280 different "reciprocal sales." Such a characterization, however, is somewhat less than accurate. At no time was there ever a one-for-one or two-for-one matching of loans. Temple's loan officers admitted that they never discussed with Waco selling mortgage loan

---

**4.** The difference between the two aggregate remaining balances were carefully calculated to

conform with criteria No. 6 of Memorandum R–49.

"A" for Waco mortgage loan "A"; etc. At all times the mortgage loans were treated by both Temple and Waco as two groups or "pools" of Memorandum R–49 mortgage loans. This conclusion is supported even more strongly by the fact that no attempt was made by either institution to discount each individual loan according to its individual characteristics. The parties simply applied a blanket discount rate of 15.75% to all of the mortgage loans in each pool which demonstrates that there was never any thought of "purchasing" individual loans, but of obtaining a pool of loans at an average discount rate applied to the entire pool. Finally, the parties did not "pay" for or deliver the loans on an individual basis. Rather, on a single day, Temple delivered all of the 360 loans it assigned to Waco at one time, and also made a single, lump sum payment for all of the 287 loans assigned to it by Waco. To characterize this transaction as anything other than the assignment of mortgage loan "pools" would be to totally ignore the reality of what occurred.[5] Therefore, the Court finds that this transaction involved the transfer of two mortgage loan "pools" rather than individual loans.

### IV. *Section 446*

■ The Government launches attacks on Temple's claimed loss from several directions. The initial attack is pursuant to 26 U.S.C. § 446. Section 446 provides in pertinent part:

(a) General Rule.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) Exceptions.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

(c) Permissible Methods.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

(1) the cash receipts and disbursements method;

(2) the accrual method;

(3) any other method permitted by this chapter; or

(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary.

Typically, this section has been used by the I.R.S. to require a taxpayer to use a different method of accounting for tax purposes than he uses for financial or regulatory purposes when the I.R.S. (the "Commissioner") is of the opinion that the change is required to clearly reflect the taxpayer's income. Thus, the taxpayer would use different methods of accounting on its "books" and on its tax return at the direction of the I.R.S. pursuant to the authority granted under Section 446.

Here, however, the Government urges a rather novel interpretation of Section 446 which presents the Court with an issue of first impression. First, the Government argues that the "accounting method" a taxpayer uses on his financial and regulatory books may differ from the method he uses in computing his taxable income *only* when the Commissioner requires it (*i.e.* the Commissioner determines that the taxpayer's financial and regulatory accounting method

---

**5.** Ironically, Temple's suggestion to treat the transaction as a number of one-for-one "reciprocal sales" is inconsistent with their position that the Court should treat the transaction as two distinct sales rather than as an exchange. The underlying characteristic of a "sale" is the transfer of property for money or its equivalent. The underlying characteristic of an "exchange" is the transfer of property for other property. This is the crux of the distinction between the two concepts. In this light, one can see that the term "reciprocal sale" is oxymoronic in the context of the Code. Reciprocity, by definition, implies the notion of exchange and the word "sale," as a term of art, necessarily precludes the notion of exchange. As a logical matter, combining the two words makes the resulting term nonsensical. Thus, it is inconsistent to call a transaction a "one-for-one sale." If a one-for-one, *i.e.* property-for-property, transfer is involved, the transaction is, by definition, an "exchange," not a "sale."

does not "clearly reflect income").[6] The Government goes on to contend, therefore, that Temple *must* use the same accounting treatment for the loss at issue for both tax and financial reporting purposes unless the Commissioner explicitly instructs it not to do so by concluding that the financial accounting treatment of the claimed loss does not clearly reflect Temple's income.

The Government supports this argument by pointing to the literal language of Section 446 and its corresponding Treasury Regulation, which provides:

> (a) General Rule. (1) Section 446(a) provides that taxable income shall be computed under the method of accounting on the basis of which a taxpayer regularly computes his income in keeping his books. The term "method of accounting" includes not only the overall method of accounting of the taxpayer *but also the accounting treatment of any item.*

Treas.Reg. § 1.446–1(a)(1) (emphasis added).

On the basis of the above emphasized language and the Supreme Court's holding in *Thor Power Tool Co. v. Commissioner of Internal Revenue,* 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), the Government maintains that Temple's "accounting treatment" of the loss at issue must be the same for both financial and tax purposes unless *the Commissioner,* not Temple, determines otherwise. However, the Government overlooks the remainder of Treas. Reg. § 1.446–1(a)(1) which states:

> Examples of such over-all methods are the cash receipts and disbursements method, an accrual method, combinations of such methods, *and combinations of the foregoing with various methods provided for the accounting treatment of special items.* These methods of accounting for special items include the accounting treatment prescribed for research and experimental expenditures, soil and water conservation expenditures, depreciation, net operating losses, etc. *Except for deviations permitted or required by such special accounting*

*treatment,* taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. For requirement respecting the adoption or change of accounting method, see section 446(e) and paragraph (e) of this section.

Treas.Reg. § 1.446–1(a)(1) (emphasis added).

When one considers the interpretation to be given Section 446 in conjunction with the Code as a whole, the language of the statute and the regulation become more clear and make more sense. If the Court were to accept the Government's interpretation of Section 446 on its face, it would mean that a taxpayer's financial accounting treatment of *any item* (*i.e.* anything) would have to be the same as the tax accounting treatment in all cases unless the Commissioner expresses the opinion that the taxpayer's financial accounting method or treatment of an item does not clearly reflect income. Thus, only the Commissioner can authorize disparate financial and tax treatment of an item. However, this position is in direct conflict with other Code provisions and the explicit language of Treas.Reg. § 1.446–1(a)(1).

Treasury Regulation § 1.446(a)(1) makes it clear that the language of Section 446 is subject to other Code provisions which require or permit "special accounting treatment" of various items. As examples of such special accounting treatment, the Regulation cites "research and experimental expenditures, soil and water conservation expenditures, depreciation, net operating losses, etc." Certain types of depreciation are a common example of disparate financial and tax accounting treatment of items which is authorized by the Code, itself, without the need for a determination by the Commissioner that the taxpayer's financial accounting treatment does not clearly reflect income. For instance, GAAP allows for the depreciation of goodwill for financial purposes, however, the Code specifically prohibits the depreciation of goodwill for

---

**6.** The parties stipulate that the I.R.S. has not expressed the opinion that Temple's financial and regulatory treatment of the loss in question did not clearly reflect income.

tax purposes. 26 U.S.C. § 167(a); Treas. Reg. § 1.167(a)–3. Another common example, not specifically mentioned in Treasury Regulation § 1.446–1(a)(1) is income taxes. GAAP allows for the deduction of federal income taxes for financial accounting purposes, nonetheless, the Code specifically disallows such a deduction for tax purposes. 26 U.S.C. § 275. In both of these situations, as in others pursuant to specific Code sections, taxpayers are obligated to follow the mandate of the Code, which entails varying their financial accounting treatment of an item from their tax treatment of the same item, without first obtaining any opinion from the Commissioner that the financial accounting treatment does not clearly reflect income. Thus, the Government's interpretation of Section 446 ultimately conflicts with other sections of the Code and would work to make Section 446 inconsistent with the Code as a whole. The more reasonable and consistent interpretation of Section 446 in this context is to read it to mean that a taxpayer must compute his taxable income using the same method of accounting as used in keeping his books *unless the accounting method or treatment of an item is specifically controlled by another section of the Code.* This implicit exception to Section 446 is necessary to prevent taxpayers having to either seek the consent or an opinion of the Commissioner that their financial accounting methods do not clearly reflect income in order to vary their financial accounting from their tax accounting even where they are required to do so by the Code itself—a situation not contemplated by the Code or its drafters. Treas.Reg. § 1.446–1(a)(1).

Once the necessary implicit exception to Section 446 is recognized, the weakness of the Government's position becomes clear—the issue in this case simply has nothing to do with Section 446 or the holding in *Thor Power Tool.*[7] Just as in the cases of depre-

ciation, federal income taxes, soil and water conservation, etc., Temple argues that the tax accounting treatment of the loss at issue is governed by 26 U.S.C. § 1001(c) which *requires* the recognition of losses on the sale or exchange of property unless otherwise provided in the Code regardless of what is permitted by GAAP and regulatory accounting principles (Memorandum R–49). The Government responds by arguing that Treasury Regulation § 1.1001 does, indeed, "provide otherwise" where a loss is claimed on the exchange of property which is not materially different, and Temple argues that the mortgage loan pools are, in fact, materially different. Thus, after running a rather circuitous route through Section 446, the issue in this case still remains, "What does the Code require (specifically Section 1001) with respect to the tax accounting treatment of the loss at issue?"

### V. *Treasury Regulation § 1.1001–1(a)*

■ The Government next attacks Temple's claimed loss on the ground that it is inconsistent with Treasury Regulation § 1.1001–1(a) which provides in pertinent part:

(a) *General Rule.* Except as otherwise provided in Subtitle A of the Code, the gain or loss realized from the conversion of property into cash, or from the exchange of property differing materially either in kind or in extent, is treated as income or loss sustained.

The Government argues 1) that Temple has not yet "realized" a loss on its "reciprocal sale" of mortgage loans and 2) the "reciprocal sales" were, in fact, merely an "exchange," that property exchanged must "differ materially in either kind or extent," and the mortgage loan pools in question were not materially different. Temple counters by arguing that the loss at issue was "realized," the "reciprocal sale" trans-

---

7. *Thor Power Tool* holds only that the Commissioner has broad discretion in determining whether a taxpayer's financial accounting treatment of inventories clearly reflects income, and that the method used by the taxpayer in that case did not "clearly reflect income." It in no way addressed the issue presented here because the particular accounting method at issue in

that case was not governed or controlled by any specific Code section, which is precisely what kept that case out of the implicit exception to Section 446 and within the purview of the Commissioner. Here, there is a specific Code section which speaks to the problem and the question is to determine what it is saying.

action involved bona fide "sales" and was not an exchange, and even if the transaction is characterized as an "exchange" the mortgage loan pools were, in fact, materially different.

## A. *Realization*

The Parties have stipulated that "realization" of Temple's claimed loss is at issue in this case. However, the Court is of the opinion that the Parties have confused "realization" of a loss with "recognition" under the Code. Nonetheless, it is a long-standing principle that no loss (or gain) may be "recognized" for tax purposes unless it is first "realized." 26 U.S.C. § 1001(a); Treas.Reg. § 1.1001–1(a); *Eisner v. Macomber*, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920); *Helvering v. Bruun*, 309 U.S. 461, 60 S.Ct. 631, 84 L.Ed. 864 (1940); *Commissioner of Internal Revenue v. Glenshaw Glass Co.*, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955); 1 Bittker Federal Taxation of Income, Estates, and Gifts, ¶ 5.2 (1981) ("[R]ealization is so basic to the taxing structure of existing law that the general principle is simply not challenged"). Thus, the first question to ask when examining the deductibility of any loss is, "Has the loss been 'realized?'" However, posing this fundamental and well-known question is a far cry from answering it.

The confusion about realization in this case, as in many other cases, has been generated by the fact that the concept of realization has two distinct, component aspects which must both be satisfied before a gain or loss is "realized" for tax purposes.[8] First, there is the economic (or what can be called the "common sense") aspect of realization. That is, "Has there been an actual economic gain or loss?" This is generally put in terms of an economic increase or decrease in a taxpayer's net worth. This aspect has often been summed up by the famous paraphrase from *Eisner v. Macomber*, "Is the taxpayer, in fact, richer or poorer?" Second, there is the practical accounting aspect of realization. Namely, that for accounting and valuation purposes the increase or decrease in a taxpayer's net worth (*i.e.* the value of his assets) will not be accounted for ("realized" as a practical matter) until there is some "event that freezes or fixes the gain with sufficient certainty so that it is proper to tax it." *Bittker, supra* at ¶ 5.1 (quoting Lowndes, Current Conception of Taxable Income, 25 Ohio St.L.J. 151, 173 (1964)); *see also Helvering v. Horst*, 311 U.S. 112, 115, 61 S.Ct. 144, 146, 85 L.Ed. 75 (1940) (Holding that as a rule of administrative convenience, "realization" for tax purposes must be connected with a taxable event). This second aspect of realization was developed to cope with the practical difficulties of annually computing and evaluating the fluctuations in the net worth of all of a taxpayer's assets which would not only be administratively quite difficult, speculative, and subject to unpredictability, but also could put taxpayers in the position of having to mortgage or sell property in order to pay the tax on its appreciation. This aspect also reflects the public's general distrust of "paper" gains and losses, including their instability and the imprecision of calculating them.[9] The accounting profession also follows this principle. Statement of Financial Concepts No. 5 ¶ 83 and Statement of Financial Concepts No. 6, ¶ 143 (GAAP).

A taxable event, under the Code, which suffices to satisfy the second aspect of realization is a "sale or other disposition of property" or a "sale or exchange of property."[10] 26 U.S.C. § 1001. Thus, for tax purposes, a taxpayer does not realize either a gain or a loss on the change in value of property unless there is a "sale or other disposition of the property" ("other disposition" includes the "exchange" of property).

Applying this conceptual framework for "realization" to the facts of this case it becomes clear that "realization" is not actually a contested issue. First, one asks

---

**8.** *See generally* 1 Bittker, Federal Taxation of Income, Estates and Gifts ¶¶ 5.1–5.2 (1981).

**9.** *See Bittker, supra* at ¶ 5.2.

**10.** These phrases are used interchangeably in the Code and regulations.

the question, "Has Temple suffered a real economic loss, or, more specifically, has Temple experienced a change in the net worth of the asset(s) in question?" The answer to this question has been stipulated by the Parties—the market value of the loans transferred to Waco was less than the face value of the loans due to the fact that they all bore a lower interest rate than that of similar loans at the time of the transaction (the loans were, in fact, discounted at a rate of 15.75%, and the Government does not contest the validity of this figure as reflecting market value). Thus, the Government does not contest the fact that Temple, indeed, suffered a real economic decline in the value of its property. Second, one asks, "Has there been a sale or other disposition of the property which has declined in value?" The answer to this question is also undisputed by the Government in that it concedes there has at least been an exchange of loans between Temple and Waco which constitutes a complete disposition of the loans. Therefore, it appears that the Government contests neither of the facts necessary to establish realization of the loss at issue.

The Government bases its "realization" argument on the fact that while Temple's property may have gone down in value, it experienced no change in economic position *due to the transaction* with Waco, citing *Eisner v. Macomber*, and claiming that Temple was "no richer or poorer" after the "reciprocal sale" as before. However, this confuses realization with the underlying rationale of the nonrecognition sections of the Code. Realization is not concerned with a taxpayer's relative economic position before or after a sale or other disposition. Realization has occurred as soon as 1) there has been an actual change in net worth of a taxpayer's property (it is undisputed that the loans had depreciated in value) and 2) there has been a sale or other disposition of the property (it is undisputed that there was at least an exchange of loan pools which qualified as an "other disposi-

tion"). Whether the "exchange" or "other disposition" involves property which is of like-kind or is not materially different has nothing to do with the realization of any gain or loss associated with the sale or other disposition of property [11] for it is at that point that the decline in value of property can be fixed due simply to the fact of the transaction regardless of its economic consequences.

*Eisner v. Macomber*, relied on by the Government, simply does not speak to the situation presented by this case. In *Eisner*, the taxpayer had experienced a net increase in value of her share of a company, thus, the first aspect of realization was met (*i.e.* there was a real economic gain). However, there had yet to be a sale or other disposition of any part of the asset represented by her percentage ownership of the company. In receiving a stock dividend the taxpayer's percentage ownership of the company did not increase. The company's value or net worth may have increased, but this is no different from the situation represented by a person who owns a piece of land which appreciates from day 1 to day 2. The person owns no more land on day 2 than day 1, but its value has increased. Nonetheless, the person has not realized the increase in value for tax purposes because there has not been an economic event (*i.e.* sale or other disposition) to trigger a *fixing* of the change in net worth. The *Eisner* Court's use of the words "no richer and no poorer" in connection with the taxpayer's relative economic position before and after the issue of the stock dividend must be considered more unfortunate than significant because the Court goes on to make clear that what it meant was that the taxpayer was in no different a position relative to the particular asset in question—namely, that she still owned the same property ("x" percentage of the company). Certainly if the company's net worth increased and it responded by issuing an across-the-board stock dividend, shareholders would now

**11.** *See Cottage Savings Association v. Commissioner of Internal Revenue,* 90 T.C. 372, 390, n. 13 (1988) for a discussion of the change in the Treasury Regulations which eliminated the requirement of a change in the economic substance of an asset in an exchange in order to satisfy "realization."

hold the same percentage of what has become a bigger pie—their property simply appreciated—and there is clearly a sense in which one can say that they are now richer, although they own no more of the asset than before. This is no different from the appreciation of any other kind of property and appreciation or depreciation, alone, without a sale or other disposition of the property does not trigger realization. This is the holding of *Eisner. Eisner* and progeny do not and cannot stand for the proposition that realization concerns the economic consequences of a sale or other disposition of property once it has occurred. Consequently, *Eisner* and its progeny of "realization" cases are inapposite.[12]

Apparently, what the Government is concerned with is pointing to the economic consequences of Temple's "reciprocal sale" arrangement with Waco and arguing that Temple is in precisely the same economic position both before and after the transaction and Temple is attempting to garner the benefits of the "book" loss that, although technically realized, Temple has not yet "suffered" in reality because it immediately replaced the property with economically identical property. This is precisely the rationale which underlies the "nonrecognition" sections of the Code which operate on the presumption that a gain or loss has already been technically realized,[13] and must also be recognized for tax purposes unless a nonrecognition section directs otherwise. The Treasury Regulations clearly explain the purpose of the nonrecognition sections:

> These sections describe certain specific exchanges of property in which at the time of the exchange particular differences exist between the property parted with and the property acquired, but such differences are more formal than substantial. As to these, the Code provides that such differences shall not be deemed controlling and that gain or loss shall not be recognized at the time of the exchange. The underlying assumption of these exceptions is that the new property is substantially a continuation of the old investment still unliquidated; and, in the

---

**12.** This Court is aware of the holding in *Centennial Savings Bank FSB v. United States,* 682 F.Supp. 1389 (N.D.Tex.1988), in which the Court relied on *Eisner* and following cases (including *Weiss v. Stearn,* 265 U.S. 242, 44 S.Ct. 490, 68 L.Ed. 1001 (1924) and *Marr v. United States,* 268 U.S. 536, 45 S.Ct. 575, 69 L.Ed. 1079 (1925)) to conclude that realization is a function of the economic consequences of a transaction in a situation virtually identical to that presented here. However, this Court is compelled to disagree with the analysis of realization in *Centennial.*

In summing up its position regarding realization, the *Centennial* Court stated:

> It appears to the Court that by means of the mortgage swap, Centennial hoped to create a loss without any real change in its economic status.

> Taxation, however, is concerned with realities rather than appearances. [citations omitted], and no loss can be claimed that is not real. The loss which Centennial claims it suffered as a result of the transaction is the paper loss it had been suffering all along because its old fixed-rate mortgages had declined in value. A decline in valuation without realization, however, is not enough to entitle an institution to deduct a loss. [citations omitted].

*Centennial,* 682 F.Supp. at 1400.

First, it is not accurate to say that the Bank was "creating" a loss. The loss was as real as any loss is when assets decline in value. Speak-

ing of the Bank's economic status immediately before and after the transaction as the controlling factor in determining whether there is a "real" loss is ineffective. Rarely do economic losses occur at a specific pin point in time particularly when the loss is associated with the value of an asset like a loan. The entire notion of a "loss" in the context of property such as loans, prior to actual default, is inextricably tied to market value. This is no different from property such as land, fixtures, etc.—a decline in market value is a "real" economic loss. The question then is not "Did the bank 'lose' something in the transaction," rather it is, "When is it appropriate for the bank to account for the loss represented by the decline in value of its loans?" Second, a bank or savings and loan conducting an R–49 transaction is not claiming a loss *as a result of the transaction.* The claimed loss is a result of the decline in value or "book loss." The transaction is merely the "sale or other disposition" which constitutes the "realization event" for accounting purposes which fixes the amount of the loss.

**13.** 26 U.S.C. § 1001(c); Treas.Reg. § 1.1002–1(a); *Century Electric Company v. Commissioner of Internal Revenue,* 192 F.2d 155, 159 (8th Cir.1951) *cert. denied,* 342 U.S. 954, 72 S.Ct. 625, 96 L.Ed. 708 (1952); *Bittker, supra* at ¶ 44.1.1.

case of reorganizations, that the new enterprise, the new corporate structure, and the new property are substantially continuations of the old still unliquidated. Treas.Reg. § 1.1002–1(c).

This explanation conforms exactly to the Government's position in this case. The Government claims that the mortgage loan pools transferred between Temple and Waco are so similar that they essentially constitute the same property for all economic purposes relevant to savings and loan institutions. As such, they are, in the words of Treasury Regulation § 1.1002–1(c), "substantially a continuation of the old investment still unliquidated." While the Government may have a good argument regarding the economic substance of an "R–49" transaction, it is important that the proper analytical labels be applied here. The true nature of the Government's problem with an "R–49" transaction is more properly described as a "recognition" problem rather than a "realization" problem because the Government complains of the economic substance of the transaction rather than the fact of the decline in value of the loans or the fact that they were actually disposed of by an exchange.

Consequently, the Court finds that the loans transferred by Temple to Waco had, in fact, declined in value between the time they were issued and December 31, 1980, and Temple fully and completely disposed of the loans in a bona fide transaction with Waco which qualified as a "sale or other disposition of property" under Section 1001, thus satisfying the requirements for realization of a loss under the Code. Having concluded that Temple's claimed loss was realized, the Court must now consider the issue of whether Temple may recognize the loss.

### B. Sale v. Exchange

■ The next step in analyzing the Government's argument under Treasury Regulation § 1.1001–1 is to determine whether the transaction between Temple and Waco constituted a "sale" or an "exchange." Under the literal language of Treasury Regulation § 1.1001–1, realized gain or loss is treated as income or loss sustained for tax purposes if it is associated either 1) with the conversion of property into cash, or 2) with the exchange of property differing materially in kind or extent. Therefore, if the transaction at issue is viewed as a conversion of property into cash (a sale), the question of material difference is irrelevant and the Government's argument fails. Only if the transaction is characterized as an exchange does the question of the similarity of the loan pools involved here arise (even assuming, for the moment, the validity of the Government's interpretation of Treasury Regulation § 1.1001–1).

To date, two courts have addressed the question of the tax consequences of "R–49" transactions, each arriving at a different conclusion. *Centennial Savings Bank FSB v. United States*, 682 F.Supp. 1389 (N.D.Tex.1988) (concluding that the "material difference" standard of Treasury Regulation § 1.1001–1 applies to this situation, and that "R–49" loan pools are not materially different, thus, disallowing the loss); *Cottage Savings Association v. Commissioner of Internal Revenue*, 90 T.C. 372 (1988) and *Federal National Mortgage Association v. Commissioner of Internal Revenue*, 90 T.C. 405 (1988) (both assuming, *arguendo*, that the "material difference" standard of Treasury Regulation § 1.1001–1 applied to this situation, and that "R–49" loan pools are materially different as a matter of fact, thus, allowing the loss). However, in reaching the issue of "material difference," both courts agreed that the transaction must be characterized as an exchange rather than a sale. This Court agrees with the reasoning of both Judge Sanders and the Tax Court on this issue.

The undisputed evidence was that Temple's loan pool was transferred to Waco on December 31, 1980, and that Waco's loan pool was transferred to Temple on the same day. Also, Temple's officers admit that their intention was to conform with the requirements of Memorandum R–49, which explicitly requires a "reciprocal sale"

of·mortgage loans. Therefore, in order to conform with Memorandum R–49, it is clear that the transfer of Temple's loan pool to Waco was conditioned upon Waco's transfer of a loan pool to Temple. In other words, there would have been no transaction at all without the mutual or "reciprocal" transfer of loan pools.

In this regard, the labeling of a transaction is meaningless; the actual substance of the transaction controls its tax consequences rather than the form or label given it by the taxpayer. *Diedrich v. Commissioner of Internal Revenue,* 457 U.S. 191, 102 S.Ct. 2414, 72 L.Ed.2d 777 (1982). Thus, calling an R–49 transaction a "reciprocal sale" and transferring money as well as loans does little to mask the true substance of the transaction. The fact of the matter is that Temple and Waco swapped loan pools—neither would have "sold" to the other independently of the agreement to "reciprocally sell." "The very essence of an exchange is the transfer of property between owners, while the mark of a sale is the receipt of cash for the property." *Carlton v. United States,* 385 F.2d 238, 242 (5th Cir.1967); *see also* Treas.Reg. § 1.1002(d) ("Ordinarily, to constitute an exchange, the transaction must be a reciprocal transfer of property, as distinguished from a transfer of property for a money consideration only"). Here, the exchange of checks was a mere formality and does not suggest anything other than that the purpose of an R–49 transaction, such as the one conducted in this case, is the transfer of·property (mortgage loan pools) between owners. Such a transfer of property is, by definition, an exchange, not a sale. To view this transaction as a "reciprocal sale" is not only logically flawed, it simply ignores reality. Consequently, the Court finds that the R–49 transaction in this case constitutes an exchange under the Code.

### C. *Material Difference*

■ Once it is determined that the transaction in question was an exchange rather than a sale, the Government contends that Treasury Regulation § 1.1001–1(a) *requires* that the property exchanged "differ materially in either kind or extent" *before* a realized loss may be treated as a loss for tax purposes. The Government goes on to argue that the mortgage loan pools exchanged by Temple and Waco did not differ materially, and therefore, Treasury Regulation § 1.1001(a) disallows any loss on the transaction for tax purposes.

Initially, the Court would point out that there are two substantial semantic problems with the Government's interpretation of Treasury Regulation § 1.1001(a). The language of the Regulation merely provides that the "gain or loss realized ... from the exchange of property differing materially in either kind or extent, is treated as ... loss sustained." Read literally, this sentence says nothing about what is to be done with gain or loss realized from the exchange of property that does *not* differ materially in either kind or extent. Neither does the sentence literally condition the realization of gain or loss on whether property exchanged is materially different. The Government asks the Court to 1) tie the realization of a gain or loss on an exchange of property to the economic differences in the property exchanged, and 2) imply the negative of the statement actually contained in the Regulation (*i.e.* that "the gain or loss realized ... from the exchange of property *not* differing materially in either kind or extent, is *not* treated ... as loss sustained"). Both of these conclusions require semantical leaps which are not justified by the language of the Regulation, the language of Section 1001, case law, or the Code as a whole.[14]

---

**14.** The Tax Court, in *Cottage Savings Association,* recognized these logical and semantic problems with the Government's position, but described them as "assuming that converses are equivalents." *Cottage Savings Association,* 90 T.C. at 31, n. 14. However, the problem is not one of transposing the hypothesis with the conclusion—which is the basis of the fallacy of assuming that converses are equivalents—rather, the problem is the fallacy of implying a negative where one is not actually present. An example of the fallacy of assuming converses are equivalents is to equate the statement "no A is B" with the statement "no B is A," or to say "no A is B, therefore no B is A." This is simply not the problem with the Government's pro-

Notwithstanding the Government's interpretational problems with Treasury Regulation § 1.1001(a), the Tax Court, in *Cottage Savings Association,* after acknowledging the Government's troublesome semantics, concluded that there was no need to rule on the issue of the proper interpretation of the regulation since the Court was of the opinion that loans exchanged in an R–49 transaction are, in fact, materially different even assuming the validity of the Government's interpretation of the regulation. Here, however, this Court cannot take the same approach because the Court is of the opinion that loans exchanged pursuant to criteria of Memorandum R–49 are not, in fact, materially different.

The Tax Court in both *Cottage Savings Association v. Commissioner of Internal Revenue* and *Federal National Mortgage Association v. Commissioner of Internal Revenue* relied on two particular factual considerations inherent in the exchange of any loans pursuant to Memorandum R–49 in concluding that the loans were materially different: 1) that the loans exchanged had different obligors, and 2) that the loans exchanged were secured (collateralized) by different pieces of realty. In the view of the Tax Court, these differences were "material," that is to say they were economically significant enough to make the R–49 loans economically distinct assets. The Tax Court pointed out that the subsequent history of the loans supported its conclusion in that different loans prepaid at varying rates and essentially performed differently. However, on this point, this Court agrees with the conclusions of Judge Sanders in *Centennial Savings Bank.*

▪ It is, indeed, tempting when considering any two loans (ignoring for the moment the effect of "pooling" loans) which meet the criteria of Memorandum R–49 to pick out the fact that they have two entirely different individual obligors, thus, allowing for the possibility that subsequent performance may be radically different (*i.e.* total payment v. total default), and thereby conclude that such a potential difference in performance is, in and of itself, a significant economic or "material" difference. However, this is *post hoc* reasoning. The market value of an outstanding and unmatured loan can never take into account the *actual* future performance of a loan (this is merely to say one cannot *know* the future). Similarly, in determining whether R–49 loans are "materially different" one must look, as the *Centennial* Court did, "to the economic realities in existence *at the time of the transaction." Centennial Savings Bank,* 682 F.Supp. at 1399. This is true because, even under the Government's interpretation of Treasury Regulation § 1.1001(a), property exchanged is either "materially different" or it is not *at the time of the exchange.* Later developments are irrelevant and cannot serve either to support or defeat the conclusion regarding the material difference of property at the time of an exchange.

▪ Therefore, the question arises, "What does one look at in determining whether R–49 loans are materially different—what are the relevant 'economic realities at the time of the transaction'?" The answer to this question in the context of an outstanding, unmatured loan is the notion of "risk." When someone (*i.e.* a lending institution) attempts to evaluate the economic distinctions between two loans they do not look at the eventual actual performance because it is unknown and unknowable. However, they attempt to make their best *guess* as to the eventual performance of the loan which is the crux of the

posed interpretation of Treasury Regulation § 1.1001(a). What the Government proposes the Court do is to say that the premise "a tax loss is generated by the exchange of property which is materially different" necessarily (logically) implies the truth of the statement "a tax loss is not generated by the exchange of property which is not materially different." This fallacy is illustrated by the statement "A = B, therefore, not A = not B." Such a statement is not logically valid. While it may be true that "not A = not B" its truth cannot be derived from the statement "A = B," but has to be supported independently. In this record, the Government offers no support in the Code for the proposition that "a tax loss is *not* generated by the exchange of property which is *not* materially different" other than Treasury Regulation § 1.1001(a).

value of a loan. This guess can be described as a calculation of the overall "risk" involved in the loan. In making this calculation of the "risk" underlying a loan, one would look at a variety of factors including interest rate, term, seasoning, principal amount, collateral, obligor, type, geographic area, etc. (factors all of which are included in the requirements of Memorandum R–49). These factors all combine to form the notion of "risk"—not *actual* future performance, but *potential* future performance. This notion of "risk" is simply an expression of someone's best guess as to future performance of a loan, which is the best that can be done on an outstanding, unmatured loan and figures greatly in a loan's fair market value.

Memorandum R–49's very purpose, as stated by the Director of the OES, was to describe a certain class of loans which were identical with respect to their underlying "risk." Memorandum R–49 represents the opinion of experts in the field of lending that where the ten criteria are met the underlying risk between any two loans is equivalent and *at that point in time* the loans are economically identical. The Government's expert, Dr. Spatt, agreed with this analysis and pointed out that on the secondary mortgage market loans meeting the criteria of Memorandum R–49 are considered economically indistinguishable. Thus, the fact that there are different obligors on loans or different collateral on loans only becomes economically significant if it is such that it alters the "risk" involved.

Memorandum R–49 carefully limits the type of collateral (single family homes) and the general type of obligor (similarly seasoned notes for relatively equivalent principal amounts) available for an R–49 exchange. The obvious economic effect is to render the differences in collateral and obligors "mere" differences rather than economically significant or "material" differences. Certainly, Temple and Waco were unconcerned with these differences. No

examination of individual obligors or collateral was ever done. The two savings and loan institutions simply matched up loans on the basis of the Memorandum R–49 criteria and traded them, fully convinced they were trading what at that time were economic substitutes for one another.

It is true that these loans later showed slightly different performance histories, as one would expect. Nonetheless, this does not alter the fact that *at the time of the transaction* it was impossible to predict which set of loans this slight variation would favor making it beyond the parties' consideration and beyond the notion of "risk." To anyone looking at any two loans which meet the criteria of Memorandum R–49, or two loan pools which meet the same criteria, for the purpose of determining the economic consequences of holding them as property, the loans will be economically indistinguishable. When asked, "Which one of these Memorandum R–49 loans would you prefer," such an observer would respond, "It makes no difference, the underlying risks of the loans are so similar that they are economically identical at this time. I'll take either one."

When it is established that Memorandum R–49's very purpose for existing was to fashion a transaction that involves the exchange of what are in essence economic substitutes for one another, as has been established here, it becomes almost ludicrous to suggest that R–49 loans are at the same time "substantially identical" for financial accounting purposes and "materially different" for tax accounting purposes when the objective of both systems in this context is to accurately describe economic reality. The economic reality here is that loans which meet the criteria of Memorandum R–49 are economic substitutes for one another at the time of the transaction. Therefore, the Court finds that the loans transferred by Temple to Waco were, in fact, not "materially different" from those it received from Waco in exchange.[15]

---

15. The Court has intentionally ignored the ramifications of "pooling" R–49 loans and then exchanging "pools," because it is not necessary to a resolution of this case. However, it is arguable that pooling large numbers of R–49 loans has the effect of making even the subsequent history (future performance) of the loans statistically insignificant. Statistically, where there is

## VI. *Recognition*

■  Having concluded that the loans exchanged between Temple and Waco were not materially different, the Court must now address the validity of the Government's proposed interpretation of Treasury Regulation § 1.1001(a). In addition to the semantic problems noted *supra* the Government's interpretation suffers from an even more fundamental flaw. In this regard, it is important to properly frame the issue. Once it is determined that there has been a loss and that it has been "realized" (*i.e.* an actual economic loss coupled with a sale or other disposition which fixes the amount of the loss) the next, and final, question becomes whether it must be "recognized" under the Code.

26 U.S.C. § 1001(c) provides:

*Except as otherwise provided in this subtitle* the entire amount of the gain or loss, determined under this section, on the sale or *exchange of property shall* be recognized.

26 U.S.C. § 1001(c) (emphasis added).

This section *requires* the recognition of a realized gain or loss unless another section of the Code specifically allows for nonrecognition. *Paulsen v. C.I.R.*, 716 F.2d 563 (9th Cir.1983) ("In general, all gain [or loss] from the sale or exchange of property is taxable [deductible] unless exempted by a specific provision of the Code"). This rule is dispositive of the issues raised here. The regulation associated with this section explains its purpose clearly:

(a) General rule. The general rule with respect to gain or loss realized upon the sale or exchange of property as determined under section 1001 is that the entire amount of such gain or loss is recognized except in cases where specific provisions of Subtitle A of the Code provide otherwise.

(b) Strict construction of exceptions from general rule. The exceptions from the general rule requiring the recognition of all gains and losses, like other exceptions from the rule of taxation of general and uniform application, *are strictly construed and do not extend either beyond the words or the underlying assumptions and purposes of the exception.* Nonrecognition is accorded by the Code only if the exchange is one which satisfies both (1) the specific description in the Code of an excepted exchange, and (2) the underlying purpose of which such exchange is excepted from the general rule. The exchange must be germane to, and a necessary incident of, the investment or enterprise in hand. The relationship of the exchange to the venture or enterprise is always material, and the surrounding facts and circumstances must be shown. As elsewhere, the taxpayer claiming the benefit of the exception must show himself within the exception.

(c) Certain exceptions to general rule. Exceptions to the general rule are made, for example, by sections 351(a), 354, 361(a), 371(a)(1), 371(b)(1), 721, 1031, 1035 and 1036. *These sections describe certain specific exchanges of property in which at the time of the exchange particular differences exist between the property parted with and the property acquired, but such differences are more formal than substantial. As to these, the Code provides that such differences shall not be deemed controlling, and that gain or loss shall not be recognized at the time of the exchange. The underlying assumption of these exceptions is that the new property is substantially a continuation of the old investment still unliquidated;* and in the case of reorganizations, that the new enterprise, the new corporate structure,

a large enough number of random actors in a group or pool the random or unknown factors cancel out and the group becomes predictable as a group, much like molecules of gas in a balloon. In the case of R–49 loan pools, if they are large enough, there would be no need to worry about slight variations in future performance because for every slow payer in a pool

there would be an offsetting prepayer, for every default an early payout, etc. The net result, statistically, is that the future performance of the pools as groups can be predicted to be virtually identical. Thus, pooling simply increases the factual similarity of R–49 loans by making the future performance (underlying risk) even more calculable.

and the new property are substantially continuations of the old still unliquidated. Treas.Reg. § 1.1002–1 (emphasis added).

It becomes clear that the Government's contention that the loans exchanged between Temple and Waco are essentially economic substitutes for one another falls squarely within the rationale underlying the nonrecognition sections of the Code. A reading of Section 1001(c) and Treasury Regulation § 1.1002–1 also makes it apparent that the Code contemplates the *possible* realization of gain or loss even where the transaction may lack economic substance. The Code then specifically compensates for this outcome through the nonrecognition provisions, rather than through an implied negative in the regulation explaining the section governing the computation of gain or loss. It is unreasonable to conclude that the drafters of the Code would carefully couch the ultimate solution to an important problem which they certainly recognized in the implied negative of the language of Treasury Regulation § 1.1001(a), or that they intended such an implied negative (logically fallacious standing on its own) to act as a "super-nonrecognition section."

■ The language of the Code is unambigious on this point. Realized gain or loss *must* be recognized unless specifically excluded from recognition. The drafters then put together the "Like-kind Exchange Rule" and related provisions, 26 U.S.C. § 1031 *et. seq.*, the "Wash Sales Rule," 26 U.S.C. § 1091, the "Straddle Rule," 26 U.S. C. § 1092, and other nonrecognition sections. *See* 26 U.S.C. §§ 351(a), 354, 361(b)(2), 371(a)(1), 371(b)(1) and 721. All of these sections specifically provide for nonrecognition of realized gain or loss on the basis that the "realized" gain or loss is the product of a sale or other disposition of property which lacks true economic substance. Treasury Regulation § 1.1002–1 goes on to tell us that these sections are to be "strictly construed and do not extend either beyond the words or the underlying assumptions and purposes of the exception."

In adopting the nonrecognition sections such as the Like-kind Exchange Rule, Congress easily could have included the exchange of "like-kind" loans (*i.e.* "notes or other evidences of indebtedness"), but explicitly chose to exclude them from the coverage of the rule. 26 U.S.C. § 1031(a)(2)(B) & (C).[16] Nowhere in the Code can a nonrecognition section be found that applies to loans, notes, or evidences of indebtedness. Therefore, since it is not "otherwise provided" in the Code, Section 1001(c) acts to *require* Temple to recognize its loss.[17]

To read Treasury Regulation § 1.1001(a) in the manner proposed by the Government would make section 1001(c) and all of the nonrecognition sections meaningless surplusage in the Code. The interpretation of the Regulation proposed by the Government would effectively make Treasury Regulation § 1.1001(a) a universal and all encompassing like-kind exchange rule. If this were its intended meaning why draft Section 1031, and more particularly why except evidences of indebtedness (loans), interests in partnerships, certificates of trust, choses in action, etc.? If Treasury Regulation § 1.1001(a) is intended to disallow losses on any and all exchanges of property that is not materially different, then the exceptions of Section 1031 are an absurd effort in futility. Such an interpretation of Treasury Regulation § 1.1001(a) is simply not consistent with the remainder of the Code. To read the regulation as requiring property exchanged to be materially different before a loss may be recognized would make it a "super-nonrecognition" statute rendering all other nonrecognition sections superfluous. Such a read-

16.  Congress also chose to exclude stocks, bonds, and securities from 26 U.S.C. § 1031, but later adopted other sections, 26 U.S.C. §§ 1091 and 1092, to deal with these items.

17.  The Court is aware that an R–49 transaction fits the mold and underlying rationale for a nonrecognition transaction perfectly. However, the Code is explicit in 1) limiting nonrecognition to specific exceptions, and 2) expressly excluding evidences of indebtedness from these exceptions.

ing is not contemplated by the Code [18] or the rules of statutory construction. *United States v. American Trucking Associations*, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); *Sutton v. United States*, 819 F.2d 1289, 1295 (5th Cir.1987) (Holding that a basic principle of statutory construction is that "a statute should not be construed in such a way as to render certain provisions superfluous or insignificant.") Consequently, the Court finds that while the exchange of loans between Temple and Waco was a *transaction* utterly lacking in economic substance and the loans exchanged were essentially economic substitutes for one another, there was a realized loss and Section 1001(c) of the Code requires recognition of the loss in light of the fact that evidences of indebtedness are not covered by any nonrecognition section of the Code.

## VII. *Section 165*

◼ Finally, the Government argues that Temple's claimed loss should not be allowed because it is not a "bona fide" loss as required by Section 165. 26 U.S.C. § 165(c)(2); Treas.Reg. § 1.165(b) ("Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss."). Under Section 165, a "loss must be evidenced by closed and completed transactions, fixed by identifiable events, and, ... actually sustained during the taxable year." Treas.Reg. § 1.165(b). Once again, this raises the question of whether the loss Temple sustained was economically "real." Also, the Government argues that Temple's claimed loss runs

afoul of Section 165 because it was "purposeless apart from tax motivations." *See Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

The Court finds the Government's arguments with respect to Section 165 unpersuasive. First, Temple and Waco engaged a "closed and completed transaction." The two lending institutions did, in fact, actually exchange loan pools, totally disposing of those each formerly owned and acquiring new ones without limitations on the transfers. Second, as noted earlier, Temple had indeed suffered a real economic reduction in the value of the loans it transferred—they had declined in value—thus, the economic reality is that the loss on these assets was bona fide in the sense that it was actual, real, calculable, and fixed by an identifiable event (the exchange). Therefore, the Court finds that the requirements for deductibility under Section 165 have been met.[19]

◼ The Court also finds that the R–49 exchange between Temple and Waco was not purposeless apart from its tax motivations. It is undeniable, and the evidence supports the conclusion, that one of the primary purposes of the transaction at issue was to generate income by way of tax refunds. However, the transaction also served the legitimate purpose of allowing Temple to dispose of assets declining in value and reinvest in new assets (albeit the same kind) at a lower basis. This serves the purpose of allowing a business to cut its losses and start afresh with new assets

---

18. A more reasonable interpretation of Treasury Regulation § 1.1001(a)'s "differing materially" language is that it is a non-detailed reference to the Code's nonrecognition provisions to remind the reader that such provisions exist. A more detailed explanation of the rule is rightly reserved for Treasury Regulation § 1.1002–1 since § 1.1001(a) is concerned with explaining the methods of *computing* gains or loss, rather than the rules for either realization or recognition of those losses.

19. A careful distinction must be drawn here. Section 165, in this context, is concerned solely with the truth or reality (bona fide nature) of a claimed economic loss. It does not speak to the situation, encountered here, where a real economic loss has occurred but the "identifiable event fixing the loss" (the exchange), in effect, simply substitutes economically equivalent assets. In this situation, the question is not, "Has there actually been a loss," rather it is "Is it appropriate to 'recognize' the loss at this time since the party is essentially in the same economic position both immediately before and after the transaction?" This latter problem is explicitly dealt with by the nonrecognition sections which are to be "strictly construed." Treas.Reg. § 1.1002–1. In short, Sections 165 and 1001(a) simply were not intended to speak to the aspect of deducting losses presented by this case.

with more potential to show a profit. Should interest rates again fluctuate radically making the older loans approach their original value then Temple will have to show and account for the corresponding gain (a result of the purchase at a market value lower than the face value of the loans). The savings and loan industry simply devised a transaction *not disallowed* under the Code which allowed its member institutions to achieve their business goals and tax goals without coming in conflict with regulatory requirements. Since there were legitimate reasons for this transaction other than and in conjunction with the tax motivations, the Court concludes that the claimed loss is deductible under Section 165.[20]

## VIII. *Conclusion*

There is no question that at first blush an R–49 transaction smacks of a sham. The parties to such a transaction are merely trading what are in essence economically identical assets, finding themselves in essentially the same economic position immediately after as immediately before the transaction. However, on closer analysis of this particular type of exchange (involving evidences of indebtedness) within the structure of the Code, it becomes clear that there is no valid legal reason for disallowing the loss. The transaction satisfies the requirements for realization: 1) there has been an actual, economically real loss, and 2) there has been a sale or other disposition of property (an identifiable event that fixes the amount of the loss). The loss was a bona fide decline in the value of the loans and the transaction had legitimate business purposes in conjunction with the tax refund purposes. In this situation, Section 1001(c) is clear—a gain or loss *must* be recognized unless otherwise specifically provided by the nonrecognition sections of the Code. A review of these sections reveals that Congress explicitly excluded evidences of indebtedness from nonrecognition under these very circumstances. In sum, there simply is no statutory basis in the Code for disallowing the loss.

To suggest that the Judiciary should step in and go to the logically questionable lengths of implying a negative in a Treasury Regulation which does not purport to deal with the recognition of gains and losses, but their computation, is inappropriate. This Court will not judicially legislate a universal like-kind exchange rule where Congress has explicitly addressed the issue and declined to do so, electing instead to mandate nonrecognition of the gains or losses on only particular types of transactions. If the drafters of Memorandum R–49 were looking for a loophole in the tax laws, then the only response can be that they have found one, and it is a loophole that by its nature cannot be judicially closed. The law in this area is simply not amenable to the Government's position, and provides a classic example of the oft-used phrase "the Court must take the law as it finds it." Therefore, the Court finds that the loss claimed by Temple for tax year 1980 as a result of the R–49 transaction with Waco is realized, must be recognized, and is deductible. Consequently, Temple is entitled to tax refunds in the amounts stipulated by the Parties.

SO ORDERED.

---

**20.** *See Fender v. United States,* 577 F.2d 934 (5th Cir.1978). *Fender* held that, standing alone, the tax motivation behind a transaction is an insufficient basis for disallowing a deduction under Section 165. Tax avoidance must be the *sole* purpose of a transaction, that is, a transaction must have absolutely no purpose other than to lower tax liability before it comes within the ambit of Section 165.